The EALING CORPORATION,
Plaintiff, Appellant,

v.

HARRODS LIMITED,
Defendant, Appellee.

No. 85–1813.

United States Court of Appeals,
First Circuit.

Argued Feb. 4, 1986.
Decided May 16, 1986.

William P. Stimson with whom Katherine J. Ross and Sullivan & Worcester, Boston, Mass., were on brief, for plaintiff, appellant.

Joseph L. Cotter with whom John C. Englander and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for defendant, appellee.

Before COFFIN and BOWNES, Circuit Judges, and PETTINE,* Senior District Judge.

BOWNES, Circuit Judge.

Plaintiff-appellant Ealing Corporation (Ealing) appeals the dismissal of its combination contract/tort claim against defendant-appellee Harrods, Ltd. (Harrods) for "lack of jurisdiction over the person." Fed.R.Civ.P. 12(b)(2). Ealing alleged that Harrods breached express and implied agreements governing a marketing venture between the two companies whereby a "pilot scheme" was set up for the catalog sale of Harrods' merchandise in the United States. In addition, Ealing alleged that its business relationship with Harrods was premised upon Harrods' false and misleading representations on which Ealing relied to its detriment. After both parties had submitted numerous affidavits and exhibits, the district court dismissed the action for lack of personal jurisdiction. We disagree with the district court's conclusion that there was no basis for jurisdiction under state law.

* Of the District of Rhode Island, sitting by designation.

It is well settled that when a court's personal jurisdiction over a defendant is contested, the plaintiff has the burden of showing that jurisdiction exists. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Dalmau Rodriguez v. Hughes Aircraft Co.*, 781 F.2d 9, 10 (1st Cir.1986); *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 904 (1st Cir.1980); *Lizotte v. Canadian Johns-Manville Company*, 387 F.2d 607, 608 (1st Cir.1967). This burden, absent an evidentiary hearing,[1] is a threshold requirement. If the plaintiff makes a *prima facie* showing of jurisdiction supported by specific facts alleged in the pleadings, affidavits, and exhibits, its burden is met. *See Kowalski v. Doherty, Wallace, Pillsbury and Murphy*, 787 F.2d 7, 9–10 (1st Cir.1986); *Murphy v. Erwin-Wasey, Inc.*, 460 F.2d 661, 665 (1st Cir.1972); 2 J. Moore, J. Lucas, H. Fink & C. Thompson, Moore's Federal Practice ¶ 4.41–1[3], 4–471–72 (2d ed. 1986); 2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 12.07[2.–2], 12–55–56 (2d ed. 1985).

Harrods is a British corporation which operates the renowned "Harrods" retail store in the Knightsbridge section of London. Harrods is not registered to do business in Massachusetts nor has it ever owned or leased property in Massachusetts. Ealing is a Delaware corporation. Its principal place of business is in South Natick, Massachusetts.

In the late spring/early summer of 1983, Paul D. Grindle, chairman of Ealing's board of directors and its chief executive officer, approached Harrods with a marketing proposal. The essence of Grindle's plan was that a joint mail order venture be established whereby Ealing would, through one of its subsidiaries engaged in the mail order sale of fine merchandise, utilize its expertise to prepare and distribute a catalog which offered Harrods' merchandise by mail to selected customers in the United States and abroad. During discussions that summer, primarily between Grindle and Harrods' assistant managing director, Lionel F. Drewitt, Harrods decided to deal only with Ealing and not its subsidiary. In September 1983, it was decided that initially Ealing would proceed under a pilot scheme to produce and distribute 50,000 copies of a 32-page catalog of crystal, glass, and china products. Discussions in October and November between Grindle and representatives of Harrods focused on the operational details of the pilot scheme.

Although negotiations regarding the operation of the scheme had taken place in London, Grindle was in South Natick, Massachusetts, when he received a telex on December 9, 1983, from Drewitt containing a "draft letter of agreement" containing twelve paragraphs of terms and conditions respecting the pilot scheme. The final draft mirrored the telex with the exception of the commencement and completion dates which had been left blank in the telex. With the exception of paragraph two pertaining to the form of the pilot scheme, none of the terms in Harrods' telex had been the subject of discussion in London. Paragraph one stated in part: "Although it is Harrods intention to negotiate with you [with] regard to the establishment of a long-term major U.S. mail order business, if the pilot scheme is successful, Harrods are [*sic*] not entering into any commitment in this respect." It is this statement which forms the basis of Ealing's fraudulent misrepresentation claim. Plaintiff contends that, even if the pilot scheme proved successful, it was never Harrods' intention to negotiate with regard to a long-term business arrangement.

Under the agreement, "[a]ll costs incurred by the parties as a result of their participation in the pilot scheme shall be borne by the parties individually" and Harrods was entitled to receive "all monies from customers in respect of purchase orders" with "no commission or other remuneration" payable to Ealing. In essence,

---

**1.** If jurisdiction were decided by an evidentiary hearing, plaintiff would have the burden of proving jurisdiction by a preponderance of the evidence. 2A J. Moore & J. Lucas, Moore's Federal Practice at ¶ 12.07[2.–2] (2d ed. 1985)

Ealing initially was to operate and finance the pilot scheme under the guidelines and restrictions set forth by Harrods. In return, Harrods agreed that should the pilot scheme prove successful, it intended to negotiate further with Ealing regarding the establishment of a long-term major United States mail order business. The draft letter ended by stating: "Please confirm your acceptance of these terms and conditions by countersigning and returning to us the duplicate copy of this[ ] letter."

On December 12, 1983, Grindle telexed his reply: "We accept your proposal and all the terms and conditions of the agreement as you present it." He suggested a starting date of December 28, 1983, and a completion date of April 30, 1984. In addition, the telex stated: "We would not like to see the paper work caught up in the Christmas mail. I will be coming to England this weekend. Would it be convenient for you if I come to your office on Monday, December 19, to sign the confirmatory final papers?" On December 20, Grindle signed the agreement in London in its letter form addressed to him in Massachusetts.

In January 1984, Ealing mailed out 49,-810 "Harrods of London" catalogs. Approximately 25,000 were mailed to United States customers of Harrods whose names and addresses Harrods had provided under the terms of the agreement.

After the first mailing, discussions ensued in January 1984 regarding an additional enlarged catalog mailing to enable the parties to evaluate fully the success of the venture. Part of the discussions had to do with Ealing's expectation of compensation for the additional 250,000 catalog mailing, as well as for a three-year marketing projection proposal and the preparation of a new 64-page catalog for fall distribution. An April 17, 1984 telex to Grindle in Massachusetts from Joseph Llewellyn Coxwell, a director of Harrods, advised Ealing of Harrods' consent to the project while at the same time limiting its commitment to the existing agreement and the success of the venture. The telex stated that payment would have to be discussed with Drewitt on Grindle's next visit to London. In May 1984, Ealing mailed out approximately 250,-000 additional catalogs of which approximately 47,800 were mailed to existing customers of Harrods. During the eleven months that the pilot scheme was operational, Harrods shipped and was paid for orders totalling $522,080.10, of which $13,-385.36 were orders placed by Massachusetts customers.

Grindle was in London during early June 1984 for a scheduled meeting to discuss the success of the joint marketing venture and negotiate additional proposals. The meeting was cancelled due to Drewitt's unavailability. Grindle, however, felt reassured by the meeting agenda and other verbal assurances that it was still Harrods' intention to negotiate a long-term arrangement. After returning to the United States, Grindle received by regular mail on June 13 a letter dated May 25, 1984, amending the original agreement in one respect: authorizing the 250,000 catalog mailing and extending the agreement to September 30, 1984. After advising Drewitt's office that he had just received the letter, Grindle countersigned the agreement as requested and returned it to Harrods. Subsequently, on July 13, Grindle, who was again in London, hand delivered a memo dated July 11, 1984, to Coxwell of Harrods expressing his uneasiness at how the pilot scheme was being handled.

Grindle, while in London, worked daily from July 13 to July 26 on preparing the fall catalog. No one from Harrods directed him to suspend activities. At a meeting on July 26, 1984, Drewitt asked Grindle how the fall catalog was progressing. It was at this point that the business relationship broke down. Grindle refused to lay out more than the costs already incurred without compensation and/or further negotiations. Drewitt insisted that Harrods and Ealing had an agreement that precluded compensation. Drewitt did not discuss the success of the pilot scheme nor did he address the issue of further negotiations. The upshot was that Harrods' relationship with Ealing would be wound down and terminated. Subsequent discussion the next day resulted in Ealing's maintaining the South Natick, Massachusetts, operation

through September 30, 1984, if Harrods underwrote all costs. On returning to Massachusetts in late July, Grindle found a letter from Coxwell dated July 13, 1984, directing Ealing to suspend preparation of the fall catalog. The letter was in response to Grindle's hand delivered memo dated July 11.

The pilot scheme involved almost daily communications by telex, telephone or overnight letters back and forth between Ealing and Harrods regarding orders, customer questions about merchandise and account numbers. In addition, pursuant to the agreement, Ealing had to provide Harrods with weekly detailed reports regarding the scheme as well as respond to any request for information from Harrods. Illustrative of the latter are two letters from Harrod's service manager, Walter Cooper, dated June 21 and June 22, 1984, sent to Ealing at South Natick, Massachusetts, containing detailed accounting instructions, as well as requesting such information as explanations for accounting discrepancies and a list of returned merchandise held at South Natick.

Although Ealing was primarily responsible for the day-to-day operation of the South Natick, Massachusetts, facility, Harrods' participation in the venture is evident by its requiring that Ealing get its approval for publishing the catalog, establishing facilities, obtaining a post office box and a toll-free telephone number, and handling customer inquiries, orders, and payments. Money received was paid into a South Natick bank account opened on Harrods' behalf and to which only directors and officers of Harrods had access. The South Natick, Massachusetts, facility was visited by Harrods' New York-based public relations consultant prior to termination of the pilot scheme. Other than this, no Harrods' employee visited the Natick facilities until Cooper came to Massachusetts to determine the cause and extent of accounting discrepancies and to ensure a successful "wind-down" of Ealing's operations.

In determining whether jurisdictional requirements have been met, we look first to state law. *Gray v. O'Brien*, 777 F.2d 864, 866 (1st Cir.1985); *Hahn v. Vermont Law School*, 698 F.2d 48, 49–50 (1st Cir.1983). A Massachusetts court may exercise personal jurisdiction over a foreign defendant when it is authorized by state statute *and* is consistent with due process. *Howse v. Zimmer Manufacturing Company, Inc.*, 757 F.2d 448, 451 (1st Cir.1985); *Campbell v. Frontier Fishing and Hunting, Ltd.*, 10 Mass.App. 53, 405 N.E.2d 989, 990 (1980); *Good Hope Industries, Inc. v. Ryder Scott Co.*, 378 Mass. 1, 389 N.E.2d 76, 79 (1979). The first step of our analysis, therefore, is to determine whether jurisdiction is authorized by statute. *Morrill v. Tong*, 390 Mass. 120, 453 N.E.2d 1221, 1227 (1983); *Good Hope*, 389 N.E.2d at 80.

Ealing argues that Mass.Gen.Laws Ann. ch. 223, § 38,[2] (223, § 38) and Mass.Gen. Laws Ann. ch. 223A, § 3 (223A, § 3) authorize jurisdiction over plaintiff because Harrods was "engaged in or soliciting business" in Massachusetts, 223, § 38, or met the "transacting any business" requirement of 223A, § 3(a).[3]

Plaintiff also argues that the December 9, 1983 telex sent to it in Massachusetts constitutes a basis for personal jurisdiction under 223A, § 3. This contention is founded on *Whittaker Corp. v. United Aircraft Corp.*, 482 F.2d 1079, 1084 (1st Cir.1973), and *Murphy v. Erwin-Wasey, Inc.*, 460

---

**2. § 38. Foreign corporations**

In an action against a foreign corporation, except an insurance company, which has a usual place of business in the commonwealth, or, with or without such usual place of business, is engaged in or soliciting business in the commonwealth, permanently or temporarily, service may be made in accordance with the provisions of the preceding section relative to service on domestic corporations in general, instead of upon the state secretary under section fifteen of chapter one hundred

and eighty-one. Amended by St.1939, c. 451, § 61; St.1976, c. 252, § 10.

**3. § 3. Transactions or conduct for personal jurisdiction**

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's

(a) transacting any business in this commonwealth[.]

F.2d at 663–4, holding that a fraudulent misrepresentation made in the state, whether made by a personal representative of a defendant within the state or made by the defendant via mail or other communication networks, constitutes an act which confers jurisdiction under 223A, § 3(c).

Chapter 223A, § 3(c) reads: "A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's causing tortious injury by an act or omission in this commonwealth." Ealing did not specifically refer to subsection (c) of 223A § 3, either below or before us, but it cited to both *Whittaker* and *Murphy* in its district court and appellate briefs for the proposition that "[t]he conveyance of fraudulent misrepresentations to Ealing in Massachusetts constitutes a basis for personal jurisdiction under Mass.Gen.Laws ch. 223A, § 3." Plaintiff's Brief at 17; Appendix at 225–26. Since both *Whittaker* and *Murphy* relied specifically on § 3(c) for their jurisdictional findings, the failure to include "(c)" after "§ 3" was inconsequential. Harrods was certainly aware that one of Ealing's jurisdictional claims was based on fraudulent misrepresentations made in Massachusetts. It devoted four and one-half pages of its brief to refuting this contention and attempting to show why *Murphy* did not apply. Defendant's Brief at 36–41. We, therefore, turn to a consideration of § 3(c).

Plaintiff alleged that the first time it considered defendant had an obligation under the agreement to negotiate if the pilot scheme was a success was when it received the December 9 telex from Harrods. Plaintiff filed numerous affidavits and exhibits containing facts which, if proven, would support a claim that Harrods, at the inception of the marketing venture, had no intention of negotiating with Ealing whether the pilot scheme was successful or not. This would constitute a tort. "A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." Restatement (Second) of Torts § 530(1) (1976). This is a sufficient basis for jurisdiction under 223A, § 3(c). *See Whittaker Corpo-*

*ration,* 482 F.2d at 1084 (alleged deceitful representation made in Massachusetts by defendant's employee concerning plaintiff's noncompliance with specifications is basis for jurisdiction under 223A, § 3(c)); *Murphy,* 460 F.2d at 663–64 (defendant's mailing of check to plaintiff, which plaintiff alleged, by implication, fraudulently misrepresented the amount due is basis for jurisdiction under 223A, § 3(c)); *Burtner v. Burnham,* 13 Mass.App. 158, 430 N.E.2d 1233, 1236–37 (1982) (defendant's alleged misrepresentations by mail and telephone to plaintiff in Massachusetts regarding acreage of property is basis for jurisdiction under 223A, § 3(c)).

Harrods argues that no fraudulent misrepresentation could arise from the December 9 telex, that if there were any fraudulent misrepresentations, they were made in England, and that, in any event, Ealing did not rely on the alleged false misrepresentations in the telex. This argument overlooks the fact that we are dealing with a dismissal on the pleadings under Federal Rule of Civil Procedure 12(b)(2). Harrods' contentions go to the merits. Ealing's affidavits and exhibits are sufficiently specific to sustain jurisdiction under 223A § 3(c) and withstand a motion to dismiss on the pleadings.

Although it is a closer question, we also think that plaintiff has established *prima facie* jurisdiction under 223A, § 3(a)— "transacting any business" in Massachusetts. The Supreme Judicial Court of Massachusetts has ruled that 223A, § 3(a) should be construed broadly.

> The statute's reference to "transacting any business" does not require that the defendant have engaged in commercial activity. That language is general and applies to any purposeful acts by an individual, whether personal, private, or commercial.

*Ross v. Ross,* 371 Mass. 439, 358 N.E.2d 437, 439 (1976). *See also Hahn,* 698 F.2d at 50; *Nova Biomedical Corp. v. Moller,* 629 F.2d 190, 193–94 (1st Cir.1980).

One of the seminal Massachusetts cases on the scope of § 3(a) jurisdiction is *Good Hope Industries,* 389 N.E.2d at 76.

It held: "General Laws c. 223A, § 3(a), gives rise to jurisdiction if the defendant either directly or through an agent transacted any business in the Commonwealth and, if the alleged cause of action arose from such transaction of business." *Id.* at 80. In *Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc.*, 764 F.2d 928, 932 (1st Cir.1985), we held that mailing four letters and making one telephone call to Massachusetts satisfied the "transacting any business" requirement of § 3(a). In *Nova Biomedical,* we found that mailing two letters charging patent infringement and threatening litigation satisfied the statutory prerequisite. 629 F.2d at 193–95. Here, the cause of action arose from the sending of a telex to plaintiff in Massachusetts. We hold that the "transacting any business" requirement of § 3(a) has been met.

Finding jurisdiction under the Massachusetts long-arm statute alone, of course, does not confer jurisdiction over defendant. The hurdle of constitutional due process requirements must also be cleared.

■ Explicit in the long-arm statute is the specific-jurisdiction requirement that the cause of action arise from defendant's activity within the state. *See American Freedom Train Foundation v. Spurney,* 747 F.2d 1069, 1074 (1st Cir.1984); *Burtner,* 430 N.E.2d at 1237; *Wood v. Wood,* 369 Mass. 665, 342 N.E.2d 712, 716–17 (1976). "When a cause of action arises from the defendant's contacts within the forum, less is required to support jurisdiction than when the cause of action is unrelated to those contacts." *Vencedor Manufacturing Company, Inc. v. Gougler Industries,* 557 F.2d 886, 889 (1st Cir.1977) (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 317, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The Massachusetts courts have recognized that in a proper situation "a single act within the forum may ... be sufficient to warrant the assertion of jurisdiction over a defendant." *Morrill,* 453 N.E.2d at 1229. This is particularly true where the act is intentional or where the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking

the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); *Nova Biomedical,* 629 F.2d at 193 n. 3; *Vencedor,* 557 F.2d at 890; *Whittaker,* 482 F.2d at 1083; *Murphy,* 460 F.2d at 664. The question is whether "defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

In *Murphy,* we held:

Where a defendant knowingly sends into a state a false statement, intending that it should there be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state. The element of intent also persuades us that there can be no constitutional objection to Massachusetts asserting jurisdiction over the out-of-state sender of a fraudulent misrepresentation, for such a sender has thereby "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

460 F.2d at 664 (footnote omitted). The element of intent inherent in sending a fraudulent misrepresentation into the state has been analogized to "the frequently hypothesized but rarely encountered gunman firing across a state line." *Buckley v. New York Post Corp.,* 373 F.2d 175, 178–79 (2d Cir.1967) (cited in *Murphy,* 460 F.2d at 664; *Burtner,* 430 N.E.2d at 1236). *Buckley* also held that there was no constitutional problem in basing jurisdiction upon a single isolated tort committed by a New York corporation in Connecticut against a Connecticut resident. 373 F.2d at 181. There can be no constitutional objection to asserting jurisdiction under 223A, § 3(c)—"causing tortious injury by an act" in Massachusetts.

Nor is there any due process barrier to jurisdiction under § 3(a)—"transacting any business" in Massachusetts. In addition to the telex of December 9, 1983, there were

numerous communications by telex, telephone and overnight letters back and forth from London to Natick about the details of the pilot scheme. Harrods sent at least two letters to Ealing in Massachusetts requesting business information. Ealing had to obtain approval from Harrods for minutiae of the operation: obtaining a post office box and a telephone number, setting up facilities, and the handling of customer inquiries, orders and payments. And a bank account in Harrods' name was opened in Massachusetts to which it alone had access. To complete the "contacts" picture, an agent of Harrods visited the Massachusetts facility prior to the termination of the pilot program. We hold that the constitutional due process requirements as explicated in *International Shoe, Hanson v. Denckla,* and *World-Wide Volkswagen* were met. *See also Hahn,* 698 F.2d at 51–52.

*Reversed and remanded.*