AMERICAN INTERNATIONAL RENT-
A-CAR CORPORATION, Plaintiff,

v.

Ralph J. CROSS, Crovans, Inc., and
Crobo, Inc., Defendants.

Civ. A. No. 88–0881–Y.

United States District Court,
D. Massachusetts.

March 31, 1989.

David J. Butler, Brownstein Zeidman and
Schomer, Washington, D.C., Michael J.
McHugh, Rich, May, Bilodeau & Flaherty,
Boston, Mass., for plaintiff.

Palmer & Dodge, John T. Williams, Bos-
ton, Mass., Gary Cross, Dunway & Cross,
Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

The defendants, Ralph J. Cross
("Cross"), Crovans, Inc., ("Crovans"), and
Crobo, Inc. ("Crobo") (collectively, the "li-
censees") have moved for dismissal of this
contract action arguing that the Court
lacks personal jurisdiction over them. As
the Court rules that it does not have per-
sonal jurisdiction over the defendants, it
allows their joint motion to dismiss.

## I. BACKGROUND

■ When personal jurisdiction over a
defendant is contested, the burden falls on
the plaintiff, through affidavits and other
competent evidence, to make out a prima
facie case that personal jurisdiction exists.
*E.g., Marine Charter & Storage Ltd., Inc.
v. Denison Marine, Inc.,* 701 F.Supp. 930,
931–32 (D.Mass.1988); *Val Leasing, Inc. v.
Hutson,* 674 F.Supp. 53, 55 (D.Mass.1987);
*North American Video Corp. v. Leon,* 480
F.Supp. 213, 216–17 (D.Mass.1979). The
facts relevant to American International
Rent–A–Car Corporation's ("American In-
ternational") case for personal jurisdiction,
as established by the evidence in the
record, are as follows.

American International is a Delaware
corporation with its principal place of busi-
ness in Massachusetts. Affidavit of John
Prior ("Prior Aff.") at para. 1. American
International is engaged in the business of
licensing franchisees to use its service
marks in operating car rental businesses
throughout the United States. *Id.* Ameri-
can International was based in Texas until
September, 1987. Following its April, 1987
merger with a corporation headquartered
in Massachusetts, the operations of the
original American International were
moved from Texas to Boston. The defen-

dant Cross has been a resident and citizen of Virginia since 1963 and is the majority stockholder of both Crovans and Crobo. Affidavit of Ralph J. Cross ("Cross Aff.") at paras. 4–6. Crovans, a Virginia-based company, and Crobo, a North Carolina-based company, are engaged in the business of renting cars to the general public. *Id.* at paras. 5–7.

Over the course of ten years, beginning in September, 1974, the three defendants entered into license agreements with American International's predecessor, a Texas-based company of the same name (for clarity's sake, hereinafter referred to as "Texas American International"). Prior Aff. at para. 3. The various license agreements and amendments to the license agreements granted the defendant Cross, and the two companies he controlled, licenses to operate automobile rental businesses under the American International name in various cities and counties in Virginia, North Carolina, and Georgia (the "licensed areas"). Cross Aff. at para. 11. The six license agreements at issue here are substantially identical and provide that the laws of Texas shall apply in their construction. License Agreements at para. 12(d). The two amendment documents also provide that Texas law will govern. Amendments to the Licensing Agreements ("Amendments") at para. 5. Texas American International, as a Texas Company, signed these documents in Texas. Cross signed the documents in Virginia both on behalf of himself and as representative of his companies, Crovans and Crobo. *See* Cross Aff. at para. 9.[1]

Two of the licensees, Cross and Crovans, and Michael Evans, an employee and minority stockholder in Crovans, exercised their right to purchase stock in Texas American International. Prior Aff. at para. 5; Cross Aff. at para. 13. At the various times that Texas American International stock was purchased and the license agreements and amendments were signed, Cross was in Virginia and American International's offices were in Texas. Cross Aff. at paras. 8, 9, 14.

On January 15, 1987, Cross travelled to Boston and stayed overnight in order to acquaint himself with a company which was interested in acquiring Texas American International. Cross Aff. at para. 16. That corporation was Abbey–North, a Delaware corporation owned by Nicholas A. Yebba, with its principal place of business in Boston, Massachusetts. Prior Aff. at para. 4. Also that month, Cross attended a meeting in Boston to discuss the proposed acquisition of Texas American International. He returned to Virginia the same day. Cross aff. at para. 17. On February 10 and 11, 1987, Michael Evans attended shareholder and licensee meetings held in Dallas regarding offers to purchase Texas American International. Prior Aff. at para. 6. Evans held proxies and voted the shares of Ralph Cross and Crovans with regard to the sale of Texas American International. *Id.*

Although Cross, Evans, and Crovans declined to sell their shares to Abbey–North, Abbey–North purchased a controlling interest in Texas American International on April 30, 1987. The result was a merger of Texas American International into Abbey–North, with Abbey–North surviving the merger. Prior Aff. at para. 4; Cross Aff. at paras. 18–19. In September, 1987, all American International operations in Texas were shut down and brought to Massachusetts as Abbey–North changed its name to American International. Prior Aff. at

---

**1.** These agreements include: an October 1, 1974 license agreement between American International and Cross, which covered various Virginia areas (*see* Amended Complaint, Exhibit A); a May 19, 1976 American International–Cross license agreement also covering certain Virginia areas (Exhibit B); an October 18, 1977 license agreement between American International and the predecessor of Crovans (Ron Hoel Enterprises, Inc.) covering certain Virginia and North Carolina areas (Exhibit C); an August 15, 1981 American International–Crovans license agreement covering parts of North Carolina (Exhibit D); an October 5, 1981 American International–Cross license agreement for Georgia areas (Exhibit E); a January 31, 1983 amendment to the above license agreements, except the North Carolina area agreement (Exhibit F); a June 1, 1984 American International–Crobo license agreement covering certain North Carolina counties (Exhibit G); and an amendment to the June 1, 1984 license agreement (Exhibit H).

para. 10. Cross, Michael Evans, and Ellen Cross (General Manager and Secretary of R. Cross, Inc., the management company for both Crovans and Crobo) attended American International's annual licensee meeting in Boston on October 14–16, 1987. Prior Aff. at para. 21; Cross Aff. at para. 21.

Since September, 1987, each of the licensees and their licensed areas continued to communicate by mail and telephone with the new American International in Massachusetts. They reported revenues, paid dues, received reservations through American International's central reservation system, and participated in the national accounts program operated by American International. Prior Aff. at paras. 11–20.[2] Cross estimates that the licensed areas obtained "less than 10%" of their business through American International's national programs. Cross Aff. at para. 23.

Neither Cross nor any business with which he has been affiliated has ever owned any real property or maintained an office in Massachusetts. Cross Aff. at para. 26. Other than the above trips, at no other time have Cross or his representatives ever made business trips to Massachusetts or conducted business with any Massachusetts enterprise. Cross Aff. at para. 22. The licensees signed the licensing agreements from three to thirteen years before the merger which resulted in the unilateral relocation of American International to Massachusetts. Once American International's headquarters had been moved, the defendants' relationship with the licensor lasted about six months as a continuation of the parties' general course of dealing pursuant to the license agreements entered into when American International was located in Texas. Cross Aff. at paras. 18, 20. Under its organizational structure, the American International license agreements allowed the licensees a considerable amount of independence in making business decisions. The licensees controlled their own local operations, such as selecting types of cars, hours, rates, and advertising. American International did not interfere with the licensees' operations even after its move to Massachusetts, except for requiring adherence to national account rates. Cross Aff. at para. 27.

The original Complaint alleges that, in January and March, 1988, the defendants

---

2. Cross reported revenues to American International in Massachusetts on a monthly basis during the relevant period of September through December, 1987 pursuant to his license agreements for the Newport News, Richmond, and Atlanta areas. Prior Aff. at para. 11. He also paid dues during that period under his Atlanta agreement. *Id.* From October 1, 1987 to February 29, 1988, Cross received, through American International's central reservation system in Massachusetts, 29 reservations for the Newport News area, 97 reservations for the Richmond area, and 126 reservations for the Atlanta area. *Id.* at para. 14. From the date of Texas American International's acquisition until termination of Cross' license agreements, phone logs reflect ten, and correspondence files reflect seven, business communications initiated by Cross or his employees to American International offices. *Id.* at para. 18.

Crovans reported revenues and paid dues to American International in Massachusetts on a monthly basis from September through November, 1987 pursuant to its license agreements for the Norfolk and Roanoke Rapids areas. Prior Aff. at para. 12. Between October, 1987, and February, 1988, Crovans received 565 reservations from the Norfolk area and 36 for the Roanoke Rapids licensed area through American International's central reservation system in Massachusetts. *Id.* at para. 15. American International's phone logs reflect five, and correspondence files reflect two, business communications initiated by Crovans or its employees from the date of Texas American International's acquisition until the termination of Crovans' license agreements. *Id.* at para. 19.

Crobo reported revenues monthly during the period September through November, 1987 and paid dues monthly in September and October, 1987 pursuant to its Charlotte area license agreement. Prior Aff. at para. 13. Also, from October, 1987, to February, 1988, Crobo received 179 reservations for its Charlotte area through American International's central reservation system in Massachusetts. *Id.* at para. 16. From the date of American International's acquisition until termination of Crobo's license agreements, phone logs reflect five business calls, and correspondence files reflect one business communication initiated by Crobo or its employees. *Id.* at para. 20.

The foregoing demonstrates that the licensees in this action are similarly situated for jurisdiction purposes. It is unclear from the record with respect to all the licensees how many of the communications (calls or letters) actually occurred after American International's headquarters were moved to Boston.

were not fulfilling their contractual obligations. After providing the licensees with the required formal notice and opportunity to cure in accordance with paragraph 5(b) of the license agreements, on February 29 and April 20, 1988, American International informed them that it was terminating their license agreements. *See* Amended Complaint at 6–10, paras. 19–32. On April 15, 1988, American International filed this suit alleging non-payment of contractually-owed royalties and other fees.

## II. DISCUSSION

Determining personal jurisdiction is a two-step process. First, jurisdiction must be found to exist under the Massachusetts long arm statute, Mass.Gen.Laws ch. 223A, sec. 3. Second, "[t]he hurdle of constitutional due process must also be cleared." *Ealing Corp. v. Harrods, Ltd.*, 790 F.2d 978, 983 (1st Cir.1986).

American International contends that the factual constellation here—including the licensees' (or their representatives') business trips into Massachusetts, their transmittal of communications, periodic revenue reports and dues into Massachusetts, and their receipt of reservations for their areas from the Massachusetts office—points to the conclusion that the licensees "transact[ed] ... business" in Massachusetts within the literal meaning of the Massachusetts long arm statute. *See* Mass.Gen. Laws ch. 223A, sec. 3(a).[3] The only question is whether personal jurisdiction over the defendants in Massachusetts would violate due process, because the Massachusetts long arm statute functions as "an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States." *"Automatic" Sprinkler Corp. of America v. Seneca Foods Corp.*, 361 Mass. 441, 443, 280 N.E.2d 423 (1972).

■ In their motion, the three licensees make two due process arguments against this Court's exercise of personal jurisdiction. Requiring them to litigate this suit in this forum, they submit, would violate the due process clause of the Fourteenth Amendment because (1) their contacts with Massachusetts were not purposeful or voluntary, but rather were thrust upon them as a result of the licensor's unilateral acts, and (2) those contacts were insufficient to confer personal jurisdiction over the defendant licensees in Massachusetts. This Court, in essence, agrees.

It is established that "[w]hen a cause of action arises from the defendant's contacts within the forum, less is required to support jurisdiction than when the cause of action is unrelated to those contacts." *Ealing Corp.*, 790 F.2d at 983 (quoting *Vencedor Mfg. Co. v. Gougler Indus.*, 557 F.2d 886, 889 [1st Cir.1977]). The cause of action in this case, however, is not one that arises out of an act done or transaction consumated in Massachusetts. *Cf. Ealing Corp.* (holding that the sending of a telex from the United Kingdom from which the cause of action arose was enough to satisfy the requirement of 3[a]). Therefore, the due process analysis is crucial here because whatever contacts the licensees had with Massachusetts cannot be said to have given rise to the instant action.

The fairness of subjecting a defendant to suit in a distant forum governs the analysis of this question. The forum may assert jurisdiction only if the nonresident defendant has such "minimum contacts" with the state "that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice,'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), or if the defendant has performed some act "by which [it] purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its

---

**3.** The Massachusetts long arm statute permits a court to "exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action ... arising from the person's (a) transacting any business in this commonwealth." Mass.Gen.Laws ch. 223A, sec. 3(a).

Section 3(a) has been construed broadly. *E.g., Ealing Corp.*, 790 F.2d at 982; *Nova Biomedical Corp. v. Moller*, 629 F.2d 190, 193–94 (1st Cir. 1980); *see also Ross v. Ross*, 371 Mass. 439, 441, 358 N.E.2d 437 (1976).

laws," *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). The question then becomes whether the conduct and connection of the licensees with Massachusetts are such that they should "reasonably anticipate being haled into court [here]." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

In cases such as this one, where the contacts alleged revolve primarily around contracts between the parties, the "contract plus" analysis articulated in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985), must be followed to determine if purposeful conduct is present. The Supreme Court in *Burger King* enunciated three factors that courts must consider: 1) the parties' prior negotiations; 2) the terms of the contract itself; and 3) the parties' actual and contemplated course of dealing. *Id.*

*Burger King* involved a franchise contract. The relationship between the parties, however, was different in key respects from the relationship here. In *Burger King,* a franchisee was held amenable to the personal jurisdiction of the Florida courts primarily because the franchisor had been headquartered in Florida from the outset and the franchisee had entered into the license agreement knowing that he was beginning a twenty-year relationship with a franchisor from that state. The franchise agreement expressly provided that it would be deemed to have been entered into in Florida and that Florida law would govern. Other important facts were that negotiations leading up to the agreement had been conducted with the Florida headquarters and that the contract emphasized that operations, supervision, notices, and payments originated from or were to be sent to Florida. On these facts, the Supreme Court reasoned that the franchisee "most certainly knew that he was affiliating himself with an enterprise based primarily in Florida." *Burger King*, 471 U.S. at 480, 105 S.Ct. at 2186.

While in both *Burger King* and the instant case the licensees paid for the use of nationally-recognized trade names, the similarity ends there. Here, had American International not been purchased by a Massachusetts company and moved its headquarters to Boston, the licensees would have had no contact with the forum state. Furthermore, the *Burger King* licensee had entered into a personal obligation with a Florida company to pay one million dollars over the twenty-year relationship; he had obtained a twenty-year lease of real estate owned by the licensor; and the licensee had agreed "to submit to the national organization's exacting regulations of virtually every conceivable aspect of their operations." *Burger King,* 471 U.S. at 465, 105 S.Ct. at 2178.

By contrast, under American International's license agreements, the licensees could terminate the at-will relationship simply upon sixty days' notice. They acquired no interest in real estate or capital assets owned by American International in Massachusetts. Also, the hands-off decision-making structure only required adherence to national account rental terms. *See* Complaint Exhibit A, para. 5(b). Consequently, in view of the distinguishable facts, *Burger King* does not dictate that this Court can exercise personal jurisdiction over the licensees here. *See Burger King,* 471 U.S. at 485 n. 28, 105 S.Ct. at 2189 n. 28 (rejecting the notion that mere participation in an interstate franchise relationship means franchisees must reasonably anticipate out-of-state litigation).

In all of the cases most analogous to the instant action, wherein the plaintiff had relocated to the forum once its relationship with the defendant was established, no personal jurisdiction has been exercised. It is clear that unilateral activity by one who claims a relationship with the non-resident defendant cannot satisfy the requirement of contact with the forum state. *Hanson v. Denckla,* 357 U.S. at 253, 78 S.Ct. at 1239; *Kulko v. Superior Court of California,* 436 U.S. 84, 93–94, 98 S.Ct. 1690, 1697–98, 56 L.Ed.2d 132 (1978). In *Hanson,* the Supreme Court ruled that the Florida courts lacked personal jurisdiction over a Pennsylvania-domiciled settlor of a trust created in Delaware where the settlor had

moved to Florida approximately nine years after the creation of the trust and some eight years before her death in Florida and had performed only minor acts of trust administration there. The Supreme Court in *Kulko* similarly rejected a California court's assertion of personal jurisdiction over a non-resident husband who was sued for child support in the former wife's forum solely because he acquiesced in his child's desire to live in California with the mother. The court explained that "an essential criterion in all cases is whether the 'quality and nature' of the defendant's activity is such that it is 'reasonable' and 'fair' to require him to conduct his defense in that state." *Kulko,* 436 U.S. at 92, 98 S.Ct. at 1697 (citing *Int'l Shoe*).

This district has faced the situation of a party's unilateral move in *Cadman v. Bond,* 603 F.Supp. 1335 (D.Mass.1985) (Caffrey, C.J.). There, the defendants' contacts with Massachusetts also arose only when the plaintiffs moved to Massachusetts. In ruling that it lacked personal jurisdiction over the defendants, the court noted that,

> the [defendants] were forced to correspond with the [plaintiffs] in Massachusetts regarding pre-existing contractual obligations because of the plaintiffs' fortuitous move into the commonwealth. In consideration of this fact, it would be manifestly unfair to hale the [defendants] into Court in Massachusetts.

603 F.Supp. at 1337. *See also Nichols Associates, Inc. v. S. Leger Starr,* 4 Mass. App.Ct. 91, 96, 341 N.E.2d 909, 912 (1976) (holding that personal jurisdiction did not arise from the "defendant's acceptance of services which the plaintiff simply chose to perform in Massachusetts," because the parties never contemplated that any work would be done there).

It is undisputed in this case, whatever negotiations led to the execution of the American International license agreements, that no negotiations occurred in Massachusetts or with anyone from Massachusetts.

No document mentioned Massachusetts or called for performance in Massachusetts. Essentially, because American International was in Texas, no one had any basis for contemplating any Massachusetts contacts. The law chosen to govern the contracts, not surprisingly, is Texas law. The individual licensee, Cross, conducts no business in Massachusetts. He has no office, bank account, assets, agents, mailing address, telephone listing, property, or records in Massachusetts. Similarly, Crovans and Crobo are not licensed to do business, and do none, in Massachusetts. They also do not have offices, bank accounts, assets, agents, mailing addresses, telephone listings, property, or records in Massachusetts.

The first connection with Massachusetts occurred thirteen years after one licensee and three years after the other two licensees in this case had entered into their respective agreements with Texas American International. These licensees found themselves briefly in 1987 in a contractual relationship with a Massachusetts company solely because they could not prevent the Massachusetts company from purchasing substantially all of the stock of the corporate entity with whom they had contracted a number of years earlier. The trips to, and correspondence sent into, Massachusetts were occasioned by the merger and relocation of the licensor and the reservations received from the central office could not be considered business obtained from Massachusetts, *per se,* because no actions by the licensees were purposefully directed toward Massachusetts. At most, one can argue that the defendants could perhaps have refused to deal with American International upon its relocation to Massachusetts, but continued their pre-existing contractual obligations for the months preceding this suit. Such an assertion, however, hardly constitutes a sufficient basis for asserting personal jurisdiction.[4]

---

**4.** The defendants argue, and this Court agrees, that it is inherently unfair to require parties in the situation of the licensees here to make a choice between immediately terminating a contract of several years' duration or subjecting themselves to personal jurisdiction in whatever forum to which the plaintiff unilaterally decides to move.

This Court holds, weighing the factors *Burger King* requires be considered in determining whether the defendants' actions were purposefully directed toward Massachusetts, that these licensees have not established minimum contacts with Massachusetts. It would be unfair and unreasonable to require the licensees to litigate in this forum. *See Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

### III. CONCLUSION

The Court holds, therefore, that it lacks personal jurisdiction over Cross, Crovans, and Crobo. Their joint motion to dismiss is ALLOWED.