Toomey, J.
Plaintiff, Armron Corporation (“Armron”), brings this action seeking declaratory judgment concerning the patent and trademark rights of Defendant, Michael Kennedy (“Kennedy”). Armron alleges that Kennedy falsely claimed patent and trademark rights for a “CD Shield” and has made false and defamatory statements for the purpose of interfering with Armron’s actual and prospective customer relations.
Pursuant to Mass .R. Civ. P. 12(b) (2), Kennedy moves to dismiss the complaint for lack of personal jurisdiction. Armron opposes the motion, asserting that the court may exercise personal jurisdiction over Kennedy pursuant to G.L.c. 223A, §§3(a), (b), and (d).
For the reasons explained infra, Kennedy’s motion is DENIED.
BACKGROUND
The facts set forth by the parties in the pleadings and affidavits[1] are as follows:
Defendant Kennedy is a resident of Peoria, Arizona, and maintains his principal place of business in Glendale, Arizona. Kennedy is the principal officer of an Arizona company, CDR, aka the CD Repairman. CDR markets plastic shields (CD Shields) which are designed to protect compact discs from scratching. The CD shields are manufactured for Kennedy by a company in California and then stored in a warehouse in Arizona.
Plaintiff Armron Corporation is a marketing and manufacturing business located in Douglas, Massachusetts. Armand Cote (Cote) and Ron Gadbois (Gadbois) are the president and vice-president, respectively, of Armron.
OnAugust30, 1994, Kennedy sent a fax transmission to Armron containing a business proposal signed by him. That fax transmittal included a suggested business plan for a distributorship with Armron and a request for a meeting with Gadbois on September 7, 1994, at which time Kennedy would be in Massachusetts.
Kennedy traveled to Massachusetts and met with Gadbois and Cote to discuss another matter, to wit, Kennedy’s becoming a sales representative for Armron.[2] At that time, Kennedy agreed to be an independent sales representative for Armron.[3]
In June 1995, Kennedy orally agreed that he would manufacture CD Shields and supply them to Armron. The agreement also contemplated that Armron would sell the shields under the name “Armron” to its own customers.
In furtherance of that agreement, Armron, in September 1995, began selling shield presses, which are employed to apply CD Shields to compact discs, to Kennedy.
In December 1995, Kennedy became unable to ship the CD Shields to Armron in a timely manner. Accordingly, Kennedy and Armron agreed that Kennedy would ship the CD Shields directly to Armron’s customers. Pursuant to that shipping agreement, Kennedy shipped the product directly to Armron’s customers, but sent the invoices for the shipments to Armron, which, in turn, sent the invoices to the customers.[4]
DISCUSSION
The facts attendant to the dispute control the question of whether or not a Massachusetts court may exercise personal jurisdiction over a nonresident defendant. Droukas v. Divers Training Academy, Inc., 375 Mass. 149, 156-57 (1978). When the defendant is a nonresident, the court must determine (1) whether jurisdiction is authorized under the state’s long-arm statute, G.L.c. 223A, §3(a)-(h), and (2) whether the exercise of such jurisdiction comports with the due process requirements of the United States Constitution. See Tatro v. Manor Care, Inc., 416 Mass. 763, 767 (1994); Morrill v. Tong, 390 Mass. 120, 129 (1983). Jurisdiction is legitimate only when both questions draw affirmative responses. Packard v. Packard, 34 Mass.App.Ct. 543, 548 (1993).
When responding to a motion to dismiss for want of personal jurisdiction, the plaintiff “bears the burden of establishing the facts upon which the question of personal jurisdiction over a defendant is to be determined.” Nichols Assocs., Inc., v. Starr, 4 Mass.App.Ct. 91, 93 (1976). We shall, therefore, look to Armron to provide justification for this court’s exercise of personal jurisdiction over Kennedy.
A. The Massachusetts Long-Arm Statute
The Massachusetts long-arm statute permits Massachusetts courts to exercise jurisdiction over nonres *394 idents who transact any business in the Commonwealth if the cause of action arose out of such business transaction. G.L.c. 223A, §3(a).[5] Although the clause “transacting any business" has been broadly construed, it is nonetheless clear that isolated and minor transactions with Massachusetts residents will not suffice to confer personal jurisdiction over a nonresident defendant. See Telco Communications, Inc. v. New Jersey State Firemen’s Mut. Benevolent Assn., 41 Mass.App.Ct. 225, 229 (1996) (instructing that the long-arm statute be read with generosity of breadth). At bar, however, the transactions are not so de mini-mus as to permit Kennedy to avoid the reach of G.L.c. 223A, §3(a)-(h).
In a recent case discussing the “arising from” clause, the United States Court of Appeals sitting for the First Circuit applied the following “but for” causation test: Did the defendant’s contacts with the Commonwealth constitute the “first step in a train of events that result[ed] in the . . . injury?” See Lyle Richards Int’l, Ltd. v. Ashworth, Inc., No. 97-1387 (1st Cir. December 27, 1997). The answer, on the facts at bar, is “yes.” The aggregate of Kennedy’s contacts with Armron in Massachusetts, see “Background,” supra, is sufficiently substantial to satisfy the “long-arm” prong of the jurisdictional analysis. See G.L.c. 223A, §3(a). The focus turns next to the second inquiry in the analysis: whether exercising jurisdiction over Kennedy pursuant to the Massachusetts long-arm statute comports with constitutional due process and traditional notions of fair play.
B. Constitutional Due Process
1. The Question of Minimum Contacts
Kennedy’s contacts with Massachusetts consisted of, inter alia, telephone conversations with Armron’s officers, fax transmittals to Gadbois, and lunch meetings in Massachusetts with Cote and Gadbois. Kennedy argues to this court, that the meetings he attended in Massachusetts were merely peripheral to family visits he was making in the Commonwealth. Moreover, Kennedy argues that, if he has established contacts with Massachusetts, those contacts were not related to CDR, but instead were established in regard to the Audio File business and the “Fix-A-Disc” proposal.
Determinative in our inquiry is Kennedy’s December 1995 shipping agreement with Armron. Pursuant to that agreement, Kennedy made shipments of CD Shields directly to some of Armron’s customers. While it is true that those customers were in states other than Massachusetts, Kennedy did send the invoices for the CD Shields directly to Armron in Massachusetts, which in turn billed its out of state customers. In effect, therefore, while Kennedy may be correct in his assertion that the product was shipped to customers outside Massachusetts, it is uncontroverted that the invoices representing the shipments and upon which Kennedy was paid, were sent directly to, and from, Massachusetts.
Moreover, even assuming, arguendo, that the meetings with Cote and Gadbois were conducted in the course of Kennedy’s visits with family in Massachusetts, this court is persuaded that the objective of the various communiques and meetings with Armron and its officers was to discuss the marketing of Kennedy’s CD Shields and other products. At bottom, Kennedy, in his capacity as an officer for CDR met with Gadbois and Cote, in their capacities as officers of Armron, for the sole purpose of establishing business contacts with Armron.
2. The Question of Fairness
We consider, finally, whether subjecting Kennedy to personal jurisdiction in this Commonwealth will comport with constitutional principles of fairness. See International Shoe Co. v. Washington, 326 U.S. 310, 316 (1940). Our inquiry is whether the “suit offend[s] ‘traditional notions of fair play and substantial justice.’ ” Id.
By meeting with Armron’s officers in Massachusetts on at least two separate occasions, Kennedy purposefully availed CD Repairman of the privileges of operating in the Commonwealth. Moreover, Kennedy’s several and willing meetings with Cote and Gadbois in Massachusetts strongly suggest that he will not be unduly burdened by defending the suit in this Commonwealth.
Therefore, Kennedy’s conduct and his connections with this forum are sufficient to support the conclusion that Kennedy ought reasonably to have foreseen his being drawn into court in Massachusetts. See American Int’l Rent-A-Car v. Red Cross, 709 F.Supp. 272, 275 (D.Mass. 1989). “Notions of fair play and substantial justice” will not be offended should Armron be permitted to maintain its suit in Massachusetts. Id. Personal jurisdiction has been properly asserted under G.L.c. 223A, §3 and poses no challenge to protections founded upon constitutional due process considerations. Accordingly, Kennedy’s motion to dismiss for lack of personal jurisdiction is without merit.
ORDER
For the foregoing reasons, it is ORDERED that defendant Kennedy’s motion to dismiss is DENIED.

The court may examine the pleadings, supporting affidavits and exhibits when determining a question of personal jurisdiction. See Good Hope Indus., Inc. v. Ryder Scott Co., 378 Mass. 1, 3 (1979).

Subsequent to the meeting in September 1994, Kennedy again approached Armron concerning another business opportunity involving Audio File Company which has customers in Massachusetts. Armron believed Kennedy to be acting in his capacity as a general partner of Audio File Company.

It is alleged in Cote’s affidavit that, at the September 7 meeting, Kennedy also discussed the business proposal outlined in his fax of August 30. In his affidavit, Kennedy denies that allegation.

In February 1996, Kennedy met with Gadbois and Cote in Leominster, Massachusetts. The essence of that meeting was to discuss the marketing of Kennedy’s “Fix-A-Disc” mailing program. Armron asserts that the parties also discussed the pricing for the CD Shield in light of a competing product coming onto the market. Kennedy, again, disputes Armron’s assertion.

The Massachusetts long-arm statute provides, in pertinent part, as follows:
A court may exercise personal jurisdiction over a person who acts directly or by an agent... as to a cause of action in law or equity arising from the person’s ... (a) transacting any business in this commonwealth: (c) causing tortious injury by an act or omission in this commonwealth: (d) causing tortious injury in this commonwealth by an act or an omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods or services rendered in this commonwealth
G.L.c. 223A, §3(a).