FAR WEST CAPITAL, INC. and Steamboat Development Corp., Plaintiffs/Appellants,

v.

Dorothy A. TOWNE and Fleetwood Corporation, Defendants/Appellees.

No. 93–4149.

United States Court of Appeals, Tenth Circuit.

Feb. 3, 1995.

Mary Anne Q. Wood (Anthony B. Quinn and Kathryn O. Balmforth, also of Wood, Spendlove & Quinn, Salt Lake City, UT, with her on the briefs), for plaintiffs-appellants.

Charles E. Weller, Reno, NV, J. Douglas Clark of Clark & Dickey, Reno, NV (Cecilia L. Rosenauer, Reno, NV, with them on the briefs), for defendants-appellees.

Before KELLY, and HENRY, Circuit Judges, and VAN BEBBER, District Judge.[*]

HENRY, Circuit Judge.

Plaintiff Far West Capital, Inc. (FWC)[1] appeals a district court order denying personal jurisdiction in Utah over defendants Fleetwood Corporation and Dorothy Towne. We affirm.

## BACKGROUND

Ms. Towne is a Nevada resident who owns Nevada real property rich in geothermal resources.[2] Fleetwood is an Oregon corporation associated with Ms. Towne. FWC alleged the following events in its complaint. In 1988, FWC and defendants entered into what would be the first of three phases of negotiations regarding the development of Ms. Towne's land. The parties initially discussed forming a joint-venture to develop the land. However, the negotiations failed, and Ms. Towne faxed a letter to FWC in Utah suggesting that FWC contact her if it wanted to explore any arrangement other than a joint-venture.

In early 1991, the parties began a second phase of negotiations and discussed the sale of the land. However, the parties soon saw they would not be able to reach an agreement regarding the purchase price of the land and terminated negotiations.

Later in 1991, the parties entered the third phase of negotiations and explored a lease arrangement. During the course of the lease negotiations, defendants consulted with Robert Wright, a Utah resident and an expert in geothermal resources, land leases, and royalties. Mr. Wright also occasionally picked up drafts of leases from FWC in Utah and forwarded them to defendants. However, no evidence in the record suggests that Mr. Wright ever negotiated with FWC or that defendants hired Mr. Wright because he resided in Utah.

Over the course of six months, the parties conducted extensive negotiations in Nevada. FWC also alleges that the parties exchanged phone calls and defendants mailed five drafts of the proposed lease and sent approximately twelve faxes regarding changes in the leases to FWC in Utah. These negotiations were more successful than the earlier discussions, and the parties agreed to a leasing arrangement which they memorialized in two documents. Under the terms of the lease, Ms. Towne conveyed her geothermal and surface mineral rights to FWC. The lease provided that FWC would pay Ms. Towne royalty payments. The lease also provided that the agreement would be governed by Nevada law.

In a separate agreement, FWC then entered into a geothermal and mineral sublease with Fleetwood. The sublease recited that FWC had plans to build two geothermal power plants and had already executed agreements to provide power to a Nevada utility company. Also under the terms of the sublease, FWC agreed to establish an escrow account from which it would pay royalties to defendants. Like the lease with Ms. Towne, the sublease between FWC and Fleetwood further provided that Nevada law would govern its terms.

---

[*] The Honorable G. Thomas Van Bebber, United States District Judge for the District of Kansas, sitting by designation.

[1] The actual corporate entity involved in this dispute is Steamboat Development corporation, a Utah corporation wholly owned by Far West Capital, Inc., another Utah corporation. However, we will refer to this party as FWC just as did the parties and the district court.

[2] Because the district court and the parties generally do not identify which agents acted for each defendant during negotiations, and because whether the defendants acted separately is irrelevant for our decision, we generally follow the parties and the district court and refer to Ms. Towne and Fleetwood as defendants.

Shortly after it executed the agreements with Fleetwood and Ms. Towne, FWC concluded negotiations with General Electric in California regarding financing for the construction of the two power plants in Nevada, a $63,000,000 project in which it had already invested $1,500,000. General Electric asked FWC to secure a consent to the assignments of mineral rights from Ms. Towne and Fleetwood as a condition for financing. According to FWC's complaint, Ms. Towne agreed to the request, but asked for $50,000 as additional consideration. FWC agreed to make the payment under protest, arguing that Ms. Towne was bound by contract to consent. Later, General Electric asked FWC to incorporate a resource trust into the financing. Ms. Towne and Fleetwood refused to cooperate in establishing the resource trust unless FWC placed $500,000 in the trust for land reclamation, agreed that one-half of that amount would be paid to defendants whether the land required reclamation or not, and agreed that defendants would be entitled to one-half of the depletion allowance associated with the development of the land. In addition, in a letter to FWC's offices in Salt Lake City, Utah, Fleetwood threatened to declare FWC in default under the sublease unless FWC paid it royalties during the "start-up period" when FWC tested the generating equipment.

FWC brought this diversity action in the United States District Court for the District of Utah alleging breach of contract and several business torts, including counts for intentional interference with contractual relationships, economic duress, and bad faith breach of contract. Defendants filed a motion to dismiss, citing a lack of personal jurisdiction. The district court granted the defendant's motion, holding that FWC could not claim personal jurisdiction under either the Utah long-arm statute or constitutional minimum contacts jurisprudence.

FWC argues that the district court erred by not finding a prima facie showing of personal jurisdiction in light of Ms. Towne's invitation to discuss an alternate business arrangement with FWC, the location of the escrow account in Utah, the defendants' retention of an "agent" in Utah, the flow of mail and telecommunications between defendants and Utah, and the defendants' alleged commission of intentional business torts against FWC in Utah.

## DISCUSSION

 To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state *and* that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment. *See Rambo v. American So. Ins. Co.,* 839 F.2d 1415, 1416 (10th Cir.1988). In Utah, jurisdiction is appropriate only if plaintiff establishes that: (1) the defendant conducted certain enumerated activities in Utah, and (2) there is a nexus between plaintiff's claim and defendant's conduct. *See* Utah Code Ann. § 78–27–24.[3]

 The general constitutional test for personal jurisdiction is well-established. A federal court sitting in diversity "may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum State." *World–Wide Volkswagon Corp. v. Woodson,* 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980) (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)); *First City Bank, N.A. v. Air Capitol Aircraft Sales, Inc.,* 820 F.2d 1127, 1130 (10th Cir.1987). The defendant's contacts with the forum state must also be such that maintenance of the suit "does not offend traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158. A defendant's contacts are sufficient if the defendant "purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

---

**3.** The Utah long-arm statute provides for jurisdiction over an out of state resident based upon a "claim arising from" seven "enumerated acts," including: "(1) the transaction of any business within the state ... (3) the causing of any injury within the state whether tortious or by breach of warranty." Utah Code Ann. § 78–27–24.

The Supreme Court applied this constitutional standard to a contract case in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478–79, 105 S.Ct. 2174, 2185–86, 85 L.Ed.2d 528 (1985). The court "rejected ... 'mechanical' tests" and adopted a "realistic approach," which analyzed the entire relationship of the parties. *Id.* (quoting *International Shoe,* 326 U.S. at 319, 66 S.Ct. at 159–60). "It is ... prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.; see also Rainbow Travel Serv. Inc. v. Hilton Hotels Corp.,* 896 F.2d 1233, 1237 (10th Cir.1990) (applying *Burger King* ).

■ This circuit has also discussed the process for determining whether there are sufficient contacts to establish personal jurisdiction. " 'The plaintiff bears the burden of establishing personal jurisdiction over the defendant. Prior to trial, however, when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing.' " *Rambo,* 839 F.2d at 1417 (quoting *Behagen v. Amateur Basketball Ass'n of the United States,* 744 F.2d 731, 733 (10th Cir.1984), *cert. denied,* 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171 (1985) (citations omitted in original). We resolve all factual disputes in favor of the plaintiff in determining whether plaintiff has made a prima facie showing that establishes jurisdiction. *Id.*

In this case, the district court held that FWC met the first element of the Utah statute by alleging that Ms. Towne had committed torts against it and showing that defendants were conducting business in Utah. However, the district court held that FWC did not meet the nexus requirement because defendants' allegedly tortious conduct did not arise from their Utah conduct. *Far West Capital, Inc. v. Towne,* 828 F.Supp. 909, 913 (D.Utah 1993). The district court also found that the exercise of personal jurisdiction would violate constitutional due process requirements. *Id.* at 913–15.

■ On appeal, FWC argues that the district court erred in applying both the Utah long-arm statute and the federal constitutional requirements. Because Utah law regarding the long-arm statute is limited and because the district court based its conclusions regarding the Utah long-arm statute on factors that inform our constitutional analysis, we proceed to the constitutional analysis, reviewing the district court's ruling on a jurisdictional question de novo. *Rambo,* 839 F.2d at 1417. We first consider the specific factors that FWC claims create personal jurisdiction over defendants. After analyzing each factor individually and determining that none, by themselves, is sufficient to convey personal jurisdiction, we conclude that even aggregating all the alleged factors does not establish personal jurisdiction over defendants in Utah.

### Escrow Account

FWC first argues that its placement of the escrow account in Utah is sufficient to provide minimum contacts. Because defendants could claim rights to funds in the Utah account and because they received royalties from this account, FWC argues, defendants have purposefully availed themselves of the benefits of Utah law.

However, we do not find FWC's argument persuasive because FWC unilaterally chose the location of the escrow account.

> Unilateral activity of those claiming a relationship with a nonresident defendant is not sufficient and "it is essential in each case that there be some act by which the defendant purposely [Sic] avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of the laws."

*Institutional Food Mktg. Assocs., Ltd. v. Golden State Strawberries, Inc.,* 747 F.2d 448, 455–56 (8th Cir.1984) (quoting *Hanson,* 357 U.S. at 253, 78 S.Ct. at 1240); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416–17, 104 S.Ct. 1868, 1873–74, 80 L.Ed.2d 404 (1983) (holding that a court should not consider where check from bank was drawn because choosing a bank is a unilateral activity and cashing check is not purposeful availment).

FWC argues that the location of the escrow account was the subject of negotiations and that defendants could have negotiated to place the escrow account in Nevada. However, at the time of the negotiations, there is no evidence that defendants even knew the account would be located in Utah. There is thus no evidence that defendants purposefully availed themselves of Utah law by drawing royalties from the account. Because defendants did not purposefully avail themselves of Utah law when FWC unilaterally selected the location of the escrow account, we hold that FWC's choice of a Utah institution to administer the escrow account is irrelevant to the defendants' jurisdictional contacts with Utah.

### Solicitation

FWC next argues that Ms. Towne's offer to explore other relationships with FWC during the first phase of negotiations is itself sufficient to establish minimum contacts. The solicitation is some evidence suggesting purposeful availment on behalf of Mrs. Towne. *See, e.g., Burger King,* 471 U.S. at 473, 105 S.Ct. at 2182–83 (emphasizing that parties who reach into another state to create continuing contractual relationships are subject to personal jurisdiction).

However, this solicitation was so remote that it is of little value to FWC in its quest for personal jurisdiction. The solicitation took place during the first phase of negotiations, while the parties made their agreement during the third phase of negotiations—a phase substantively different and three years later than the first phase of negotiations.[4]

### Utah Agent

FWC next argues that defendants are subject to personal jurisdiction in Utah because they hired an "agent" in Utah to assist in negotiations and pick up drafts of proposed leases. By hiring Mr. Wright, FWC argues, defendants availed themselves of the privilege of conducting business in Utah and are

therefore subject to personal jurisdiction in Utah.

We disagree. Nothing in the record suggests that defendants hired Mr. Wright because of his Utah residence or that Mr. Wright's Utah residence played any part in his role as a consultant. To hold that the defendants' retention of Mr. Wright as a consultant established minimum contacts between defendants and Utah would suggest that retaining legal counsel or contracting with an accounting firm simply to consult regarding a part of a transaction would necessarily establish minimum contacts with the consultant's home forum. Such results are inconsistent with our personal jurisdiction jurisprudence and we find the defendants' retention of Mr. Wright as a consultant irrelevant to our jurisdictional discussion.

Although Mr. Wright also acted as an agent for defendants in picking up the documents, the degree of contacts attributable to this activity is severely limited by Mr. Wright's rather mechanical role as a messenger. *See, e.g., Romero v. Argentinas,* 834 F.Supp. 673, 682 (D.N.J.1993) (holding that the presence of a travel agent in the forum is not sufficient to establish personal jurisdiction over an out-of-state corporation). We therefore hold that although Mr. Wright's role as an agent for defendants in collecting drafts of proposed agreements from FWC created slight contacts with Utah, the contacts are insufficient to establish personal jurisdiction in this case.

### Telecommunications and Correspondence

FWC next cites *Ealing Corp. v. Harrods Ltd.,* 790 F.2d 978 (1st Cir.1986), for the proposition that the defendants' phone calls, and ten-to-twenty faxes and letters are sufficient to establish minimum contacts. In *Ealing,* a Massachusetts corporate plaintiff brought suit in Massachusetts against the British department store, Harrods, for fraudulent misrepresentation. Ealing and Har-

---

4. We emphasize that FWC has not alleged that Fleetwood has failed to observe corporate formalities and the legal separation between entities and is thus an alter ego for Ms. Towne. *See* William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.10 at 614 (perm. ed. rev. vol. 1990). As such, all availment based upon the remote solicitation applies to Ms. Towne alone and not Fleetwood. *See Rambo,* 839 F.2d at 1417–18 n. 3. (holding that contacts of multiple parties cannot be aggregated to reach the personal jurisdiction standard).

rods had joined in a venture to sell goods from Harrods in the United States through a direct mail catalog program. Although Ealing initially approached Harrods, and all of the face to face negotiations took place in London, England, the *Ealing* court held that the "almost daily" flow of communications between the parties for most of one year was sufficient to establish personal jurisdiction. *Id.* at 981.

■ We find *Ealing* inapposite. It is well-established that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts. *Continental American Corp. v. Camera Controls Corp.,* 692 F.2d 1309, 1314 (10th Cir.1982) ("It is fundamental that the mere quantum of contacts between the forum and the defendant is not determinative"); *Nicholas v. Buchanan,* 806 F.2d 305, 307–08 (1st Cir.1986) (per curiam) (collecting cases), *cert. denied,* 481 U.S. 1071, 107 S.Ct. 2466, 95 L.Ed.2d 875 (1987). In this case, moreover, defendants' contacts with Utah were far fewer and less important than the contacts in *Ealing.* In *Ealing,* there were almost daily telephone and fax communications involved in administering an ongoing venture rather than the ten-to-twenty scattered contacts alleged in negotiating a contract in this case. In addition, Harrods mailed 250,000 catalogs to the United States and established a toll-free number for Massachusetts customers—indications that Harrods took advantage of the market and laws of that jurisdiction. In this case, on the other hand, the transaction was governed by Nevada law and was designed to build a power plant in Nevada to provide power from Nevada geothermal resources to a Nevada utility. The communications between Nevada and Utah in this case are thus insufficient to establish minimum contacts.

*Intentional Torts*

Perhaps FWC's strongest argument is that defendants intentionally committed torts [5] against FWC in Utah and that defendants are therefore subject to personal jurisdiction in Utah under *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1983). We therefore examine *Calder* and its progeny.

In *Calder,* a California resident brought suit in California against a Florida-based corporation for libel, invasion of privacy, and intentional infliction of emotional harm. *Id.* at 785, 104 S.Ct. at 1484–85. The United States Supreme Court held that the defendant's contacts with California were sufficient to establish minimum contacts. *Id.* at 790, 104 S.Ct. at 1487. The *Calder* Court reasoned that the allegedly libelous publication reported activities in California, that most of the harm or "effects" to the plaintiff's reputation and career occurred in California and that the defendant's intentional tortious actions were aimed at California. *Id.* at 787 n. 6, 788–89, 104 S.Ct. at 1485 n. 6, 1486–87.

In *Burt v. Board of Regents,* 757 F.2d 242, 244–45 (10th Cir.1985), we applied *Calder* to a libel claim. We held that a Nebraska physician who had supervised the plaintiff in a Nebraska residency program had the requisite minimum contacts with Colorado when he mailed an allegedly defamatory letter to Colorado, where the plaintiff intended to establish a medical practice. We reasoned that "no due process notions of fairness are violated by requiring one who intentionally libels another to answer for the truth of his statements in any state where the libel causes harm to the victim." *Id.* at 245.

Courts have also applied *Calder* to business torts. However, these courts have reached different conclusions. Some courts have found allegations that out-of-state de-

5. FWC's claim is a novel one. It cites no clear authority for establishing personal jurisdiction based upon an intentional tort theory when the focus of the relationship is a contract not centered in the forum state. In addition, FWC has not defined its tort theories or marshalled more than limited facts explaining the connection of the alleged torts to Utah. At oral argument, FWC stated that it hoped to develop its theories through discovery.

However, FWC's lack of specificity diminishes its argument for personal jurisdiction. A better course of action may have been to request limited discovery from the district court in connection with the defendants' motion to dismiss. *See, e.g., Wyatt v. Kaplan,* 686 F.2d 276, 283 (5th Cir. 1982) ("when a defendant challenges personal jurisdiction, courts generally permit depositions confined to the issues raised in the motion to dismiss.") (Wisdom, J.).

fendants have injured residents of the forum state sufficient to establish in personam jurisdiction.[6] However, those courts finding personal jurisdiction based upon an intentional tort analysis have not created a per se rule that an allegation of an intentional tort creates personal jurisdiction. Instead, they have emphasized that the defendant had additional contacts with the forum.

For example, in *Coblentz GMC/Freightliner, Inc. v. General Motors Corp.*, 724 F.Supp. 1364 (M.D.Ala.1989), an Alabama corporation brought suit against the Swedish Volvo Corporation for intentional torts involving the termination of an Alabama Volvo automobile dealership. The district court noted that Volvo had established a "litigation fund" to finance litigation resulting from dealership terminations and held that the Swedish corporation could foresee the possibility of being haled into court in the victim's home forum:

> [W]hen a defendant intentionally takes some action with the knowledge that the result will be harm to a specific victim in another state, the picture involves more than mere foreseeability or the likelihood . that fortuitous and undirected conduct will have an effect in that state. When the conduct is intentional and is directed at a victim in another state, the defendant may be held to have expected its conduct to have an effect in that state, and further to have expected that the victim will bring suit for redress there.

*Id.* at 1368. The *Coblentz* court further reasoned that it was fair to allow a plaintiff to bring suit in its home forum based on fairness concerns:

> In the typical intentional tort case, it is both fair and just to allow the victim of an alleged tort to call the tortfeasor to account in the victim's home forum. A contrary result would force injured parties to go to the alleged tortfeasor for redress even though, taking the victim's position as justified at the institution of suit, the tortfeasor has knowingly brought about the situation through its actions.

*Id.* at 1371.

The court in *Borschow Hosp. & Medical Supplies, Inc. v. Burdick–Siemens Corp.*, 143 F.R.D. 472, 485 (D.Puerto Rico 1992), reached a similar conclusion. The *Borschow* court found personal jurisdiction in a case involving a claim for interference with a contract for the distribution of medical equipment in Puerto Rico and the Virgin Islands. The court held: "[W]hen a non-resident foreign defendant sends a series of letters which evince an intent to tortiously interfere with contractual obligations and travels to the forum in order to settle claims arising from such cancellation, defendant has purposely availed himself of the forum and should foresee being subject to jurisdiction." *Id.* at 485.

In contrast to *Coblentz* and *Borschow*, several circuits have found allegations of an out-of-state defendant's tortious interference with the contractual rights of a forum resi-

---

6. Defendants cite a competing line of cases that conceptualizes business torts in an entirely different manner. These cases focus upon the location of the breach, rather than the location of the alleged tort victim, and hold that a business tort creates damages where it is committed. The leading case is *American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428 (2nd Cir.1971), decided prior to *Calder*. In *American Eutectic*, the Second Circuit held that a corporation's domicile should not be determinative in creating personal jurisdiction:

> Conceptually, it is difficult for this Court to hold that a personal or property injury in another state by virtue of a tortious act committed in that state can be said to have suffered some injury within the state of New York simply because he is domiciled here.... To hold otherwise would open a veritable Pandora's Box of litigation subjecting every conceivable prospective defendant involved in an accident with a New York domiciliary to defend actions brought against them in the State of New York.

*Id.* at 434 (quoting *Black v. Oberle Rentals, Inc.*, 55 Misc.2d 398, 285 N.Y.S.2d 226, 229 (1967). Although the district court adopted this line of cases in its opinion by citing *STV Int'l Mktg. v. Cannondale Corp.*, 750 F.Supp. 1070, 1075 (D.Utah 1990), *Far West Capital, Inc. v. Towne*, 828 F.Supp. 909, 912–13 (D.Utah 1993), we do not attempt to reconcile or choose between these two lines of cases because it is clear that the contacts do not rise to the constitutional minimum for jurisdiction under either line of cases. We also note that although the district court's analysis relates to both the Utah long-arm statute and federal constitutional analysis, this line of cases proceeds from state jurisdictional statutes and is therefore arguably distinguishable from federal constitutional analysis in spite of the conceptual similarity.

dent insufficient to establish personal jurisdiction. In *Reynolds v. International Amateur Athletic Fed'n,* 23 F.3d 1110 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 423, 130 L.Ed.2d 338 (1994), American and international amateur athletic organizations banned world-class sprinter Butch Reynolds from competing in international track meets for two years because he had tested positive for steroid use at a track meet in Monaco. Reynolds brought claims in Ohio against the athletic organizations for breach of contract, defamation, and intentional interference with business relations. The Sixth Circuit held that the Ohio district court did not have jurisdiction over the international organization. *Id.* at 1118–20.

As to the contractual claims, the court noted that there was "no real evidence that a contract was negotiated in Ohio, created in Ohio, performed in Ohio, or breached in Ohio." *Id.* at 1118. The court found the fact that Mr. Reynolds resided in Ohio insufficient to establish the necessary minimum contacts with the foreign defendant. Relying upon *Helicopteros Nacionales,* the court reasoned that absent other availing factors, the choice of a residence is a unilateral one that will not allow a plaintiff to establish jurisdiction over a non-forum defendant. *Id.* at 1118–19. Even when combined with phone calls and correspondence to Mr. Reynolds in Ohio, the court found that the defendant organization did not purposefully avail itself of the benefits of Ohio law. *Id.*

Significantly, the *Reynolds* court found *Calder* distinguishable even with regard to the defamation claim. It noted that, in contrast to the defamatory publication in *Calder,* the alleged defamatory press release concerning the positive drug test involved the plaintiff's activities in Monaco, not Ohio. The court also observed that the defendant did not publish or circulate the press release in Ohio itself. Finally, the court noted that Reynolds was "an international athlete whose professional reputation is not centered in Ohio." *Id.* at 1120.

The Fifth Circuit reached a similar conclusion in *Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763, 772–73 (5th Cir.1988). The *Southmark* court found that a United States district court in Texas lacked jurisdiction over a Virginia corporation that allegedly interfered with the contractual rights of the plaintiff, a company with its principal place of business in Texas. In rejecting the argument that the district court could exercise in personam jurisdiction over the Virginia defendant because the plaintiff suffered injuries in Texas, the court observed that the agreement with which the defendant allegedly interfered "was apparently negotiated and made in Atlanta and/or New York, and there is no evidence that the agreement was made or to be performed in Texas or governed by Texas law." *Id.* at 772. Like *Reynolds,* the Fifth Circuit characterized the plaintiff's principal place of business as a "mere fortuity." *Id.* at 773.

Similarly, in *Wallace v. Herron,* 778 F.2d 391, 394–95 (7th Cir.1985), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986), the Seventh Circuit held that the mere allegation of an intentional tort does not create jurisdiction in the plaintiff's home forum under *Calder.* The court held that an intentional tort suggests purposeful availment, but is only one factor in creating minimum contacts. *Id.*

▮▮▮▮ Our review of these post-*Calder* decisions indicates that the mere allegation that an out-of-state defendant has tortiously interfered with contractual rights or has committed other business torts that have allegedly injured a forum resident does not necessarily establish that the defendant possesses the constitutionally required minimum contacts. Instead, in order to resolve the jurisdictional question, a court must undertake a particularized inquiry as to the extent to which the defendant has purposefully availed itself of the benefits of the forum's laws. The Supreme Court's observations in *Burger King,* although specifically addressed to a breach of contract claim, provide a useful framework. *See Burger King,* 471 U.S. at 478–79, 105 S.Ct. at 2185–86. We therefore examine "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 479, 105 S.Ct. at 2185. In addition, we examine the contacts created by the out-of-state defendant in committing the

alleged tort. *See Reynolds,* 23 F.3d at 1118–19; *Southmark,* 851 F.2d at 772–73; *Borschow,* 143 F.R.D. at 484–85; *Coblentz,* 724 F.Supp. at 1370–71.

In this case, the negotiations between FWC and the defendants, the terms of the agreements, the future consequences of the agreements, and the parties' course of dealing all fail to establish the necessary minimum contacts with Utah. As we have noted, the most important negotiations took place in Nevada, and the enterprise was designed to use Nevada resources to supply power to a Nevada utility. Moreover, the lease and sublease expressly provided that their interpretation was governed by Nevada law.[7] Unlike *Calder,* where the defendant's actions "were expressly aimed at" the forum jurisdiction and the forum jurisdiction was "the focal point" of the tort and its harm, the focal point of this relationship was Nevada rather than Utah. *Calder,* 465 U.S. at 789, 104 S.Ct. at 1486–87. In short, there is no indication that Utah had anything but a fortuitous role in the parties' past dealing or would have any role in their continuing relationship.

In addition, defendants' alleged interference with FWC's contractual rights does not establish the necessary minimum contacts. According to FWC's complaint, the defendants' wrongful acts consist of Ms. Towne's request for additional consideration to sign a consent to assignment submitted to her by FWC, Ms. Towne's and Fleetwood's refusal to cooperate with FWC in establishing a resource trust unless they received additional benefits, and Fleetwood's sending a letter to FWC threatening to declare the sublease in default unless FWC paid certain royalties. These allegedly tortious acts all involve disputes about rights under a series of Nevada-centered agreements. There is thus no evidence that defendants' alleged torts had any connection to Utah beyond plaintiff's corporate domicile. Although FWC argues that it

suffered the financial effects of these alleged torts in Utah where it is incorporated, we hold that under *Calder* and its progeny, the defendants' contacts with Utah are insufficient to establish personal jurisdiction in this case.[8]

### CONCLUSION

We hold that the contacts surrounding the alleged torts, solicitation, telecommunications from defendants to Utah, and Mr. Wright's forwarding of drafts of the lease agreement are so minimal that they do not establish minimum contacts and are therefore an insufficient basis for FWC to obtain personal jurisdiction in Utah over Fleetwood or Ms. Towne.

Because FWC's claim does not meet constitutional due process requirements, we do not discuss the Utah statute. For the reasons stated above, the district court's decision is AFFIRMED.

---

7. The Supreme Court has emphasized that the choice of law provision implicating the law of the forum was relevant in assessing minimal contacts. *See Burger King,* 471 U.S. at 481–82, 105 S.Ct. at 2186–87. Although the choice of law provision in this case implicates the law of another jurisdiction, we believe that it is still relevant in assessing the parties' relationship and expectations.

8. FWC submitted an affidavit with its opening appellate brief stating that Ms. Towne initiated the original contact prior to the 1988 negotiations. Because that statement of a contact so remote would not affect our holding, we decline to decide whether FWC can legitimately supplement the record on appeal.