**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PRO AXESS, INC.,

      Plaintiff - Appellant / Cross - Appellee,

v.

ORLUX DISTRIBUTION, INC.,

      Defendant / Cross - Appellant,

and

SPOROPTIC POUILLOUX, INC.,

      Defendant - Appellee / Cross - Appellant.

Nos. 03-4179, 03-4189

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:97-CV-230-TS)**

---

J. Mark Gibb, Durham Jones & Pinegar, P.C., Salt Lake City, Utah (Stephen Marshall, Durham Jones & Pinegar, P.C., Salt Lake City, Utah, with him on the briefs), for Plaintiff-Appellant/Cross-Appellee.

Gifford W. Price, Mackey Price Thompson & Ostler, Salt Lake City, Utah (Gregory N. Jones, Mackey Price Thompson & Ostler, Salt Lake City, Utah, with him on the briefs), for Defendant/Cross-Appellant and Defendant-Appellee/Cross-Appellant.

---

Before **EBEL**, Circuit Judge, **HENRY**, Circuit Judge, and **WHITE**, District Judge.*

---

**EBEL**, Circuit Judge.

---

This case arises from a contract dispute between Defendant Sporoptic Pouilloux, S.A. ("Sporoptic"),[1] a French company, and Plaintiff Pro Axess, Inc. ("Pro Axess"), a Utah corporation. The parties raise cross-appeals from a judgment and an associated order entered following a jury trial. Sporoptic, which was held liable for breach of contract, contests the district court's exercise of personal jurisdiction over it. Pro Axess, the prevailing party below, appeals the district court's denial of its post-trial motion for prejudgment interest. We AFFIRM the district court's judgment because we conclude that the court's exercise of personal jurisdiction over Sporoptic was proper. We also AFFIRM the district court's denial of Pro Axess's motion for prejudgment interest.

---

*Honorable Ronald A. White, District Court Judge, United States District Court for the Eastern District of Oklahoma, sitting by designation.

[1]Sporoptic refers to itself as both "Sporoptic Pouilloux, Inc." and "Sporoptic Pouilloux, S.A." We refer to the company as "Sporoptic" to avoid confusion.

**BACKGROUND**

Sporoptic distributes sunglasses. In the mid-1990s, Sporoptic decided to launch a line of low-cost sunglasses in the United States. To minimize the cost of manufacturing these sunglasses, Sporoptic sought to manufacture the frames for the sunglasses in Asia.

Acting both directly and through its wholly-owned subsidiary, Orlux Distribution, Inc. ("Orlux")—a California corporation with responsibility for distributing Sporoptic's sunglasses in the United States—Sporoptic contacted Pro Axess to make the arrangements necessary for such manufacturing. Sporoptic lacked experience dealing with Asian manufacturers, while Pro Axess regularly arranged for the manufacture of sunglasses frames in Asia on behalf of distributors like Sporoptic. In fact, Pro Axess had previously arranged to supply Asian-manufactured sunglasses frames to Sporoptic.

As part of this project, in 1995 Sporoptic contracted with Pro Axess to arrange for the manufacture and delivery of 28,000 sunglasses frames. Sporoptic later cancelled this order. The parties disagreed about whether the order was cancelled in a timely fashion or whether the cancellation was a breach of contract.

In January 1997, Pro Axess filed suit against Sporoptic and Orlux in Utah state court, alleging alternative claims based on breach of contract, promissory

estoppel, and misuse of an open credit account.  In March 1997, Sporoptic and Orlux removed the case to federal court.

In its answer, Sporoptic disputed the district court's ability to exercise personal jurisdiction over it.  The court noted this dispute in its pretrial order but did not rule on the issue.  Following a three-day trial in March 2002, a jury found that Sporoptic had breached its contract with Pro Axess and awarded damages of $156,264 to Pro Axess.  The jury found that Orlux did not have a contract with Pro Axess and thus had no liability in this case.

After trial, the parties litigated the issue of whether the district court could exercise personal jurisdiction over Sporoptic.  The court held that it could, and thereafter entered judgment— erroneously—in favor of Pro Axess against both Sporoptic and Orlux.

The parties filed motions to amend the judgment.  In June 2003, the district court denied Pro Axess's motion for prejudgment interest, granted Pro Axess's motion for postjudgment interest, and granted Sporoptic and Orlux's motion to amend the judgment to reflect that it lay only against Sporoptic.  The court entered its judgment on July 31, 2003.

On July 18, 2003—before the district court entered judgment—Pro Axess filed a notice of appeal.  Sporoptic cross-appealed on August 1, 2003.

**DISCUSSION**

We exercise jurisdiction over these appeals pursuant to 28 U.S.C. § 1291.[2]

I.      **Personal Jurisdiction**

We review <u>de novo</u> the district court's decision to exercise personal

jurisdiction over Sporoptic. <u>See</u> <u>Fed. Deposit Ins. Corp. v. Oaklawn Apartments</u>,

959 F.2d 170, 173 (10th Cir. 1992). Pro Axess has the burden of proving that the

court's exercise of jurisdiction was proper, though it must do so only by a

preponderance of the evidence. <u>See</u> <u>Karnes v. Boeing Co.</u>, 335 F.3d 1189, 1194

(10th Cir. 2003); <u>Soma Med. Int'l v. Standard Chartered Bank</u>, 196 F.3d 1292,

1295 (10th Cir. 1999) (examining the issue of personal jurisdiction over non-

resident defendants in federal court in Utah).

---

[2]Although Pro Axess filed its notice of appeal before the district court entered the final judgment in this case, Pro Axess's appeal is timely under Fed. R. App. P. 4(a)(4)(A)(iv), 4(a)(4)(B)(i), and 4(a)(1)(A). Sporoptic's cross-appeal is timely under Fed. R. App. P. 4(a)(3).
      Sporoptic's notice of appeal also names Orlux as an appellant. However, Sporoptic's first brief on appeal does not appear to raise an argument on behalf of Orlux, as that brief merely challenges the district court's exercise of personal jurisdiction over Sporoptic and argues that Pro Axess is not entitled to prejudgment interest on the judgment, which did not lie against Orlux. To the extent that Sporoptic's first brief does not raise an argument on behalf of Orlux, any arguments that Orlux might have asserted in this appeal are waived. <u>See</u> <u>State Farm Fire & Cas. Co. v. Mhoon</u>, 31 F.3d 979, 984 n.7 (10th Cir. 1994). To the extent that the arguments in Sporoptic's first brief are raised on behalf of Orlux, Orlux lacks standing to assert such arguments because it has not suffered an injury in fact. <u>See</u> <u>Nova Health Sys. v. Gandy</u>, 416 F.3d 1149, 1154 (10th Cir. 2005). Thus, we must treat Sporoptic and Orlux's cross-appeal as though Sporoptic were the only party named in the notice of appeal.

"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." Far West Capital, Inc. v. Towne, 46 F.3d 1071, 1074 (10th Cir. 1995). Because we agree with the parties that "general" personal jurisdiction is not applicable in this case, we turn directly to the issue of "specific" personal jurisdiction. "[T]he evaluation of specific jurisdiction in Utah mandates a three-part inquiry: (1) the defendant's acts or contacts must implicate Utah under the Utah long-arm statute; (2) a 'nexus' must exist between the plaintiff's claims and the defendant's acts or contacts; and (3) application of the Utah long-arm statute must satisfy the requirements of federal due process." Soma Med. Int'l, 196 F.3d at 1297 (alteration in original) (quotations omitted); see also Far West Capital, 46 F.3d at 1074. We address the requirements of federal due process before turning to the other two parts of the inquiry, and we hold that all the requirements are satisfied in this case.

## A.     Federal Due Process

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) (quotations omitted). Thus, a "court may exercise

personal jurisdiction over a nonresident defendant only so long as there exist minimum contacts between the defendant and the forum State." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980) (quotations omitted). "The minimum contacts necessary for specific personal jurisdiction are established if the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." Soma Med. Int'l, 196 F.3d at 1298 (quotations omitted).

Thus, an analysis of whether a court's exercise of specific personal jurisdiction comports with the Due Process Clause is a two-step inquiry. See Benton v. Cameco Corp., 375 F.3d 1070, 1075 (10th Cir. 2004), cert. denied, 125 S. Ct. 1826 (2005). First we consider whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen, 444 U.S. at 297. Second, "if the defendant's actions create sufficient minimum contacts, we must then consider whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice." OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1091 (10th Cir. 1998) (quotations omitted).

### 1.    Minimum Contacts

In determining whether a defendant has established sufficient minimum contacts with the forum state, we examine whether the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." Hanson v. Denckla, 357 U.S. 235, 253 (1958).  A defendant's contacts are sufficient if "the defendant purposefully directed its activities at residents of the forum, and . . . the plaintiff's claim arises out of or results from actions by the defendant himself that create a substantial connection with the forum state." OMI, 149 F.3d at 1091 (quotations, citations, and emphasis omitted).

### a.    Purposeful Availment

The fact that Sporoptic made a contract with Pro Axess, which is located in Utah, is not enough on its own to allow a Utah court to exercise jurisdiction over Sporoptic.  See Burger King, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum . . . the answer clearly is that it cannot.") (emphasis in original).  However, "with respect to interstate contractual obligations, . . . parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." Id. at 473 (quotations omitted).

In this case, Sporoptic solicited Pro Axess's assistance in procuring sunglasses frames. While not conclusive, this solicitation is itself "some evidence suggesting purposeful availment." Far West Capital, 46 F.3d at 1076. Sporoptic specifically sought out Pro Axess because Pro Axess had long-standing business relationships with many manufacturers in Asia.[3] While the manufacturing and shipping of the product were not to take place in Utah, services necessary for the contract were to be performed in Utah. See Benton, 375 F.3d at 1077. Such services included choosing a manufacturer for the sunglasses frames, arranging for rough handmade models to be made into machined prototypes, arranging the details for the manufacture of the frames at a plant in China, arranging for the inspection of the frames in Hong Kong, invoicing and coordinating the manufacturing process, and arranging for the shipping of the frames from Hong Kong to France. Although the agreement between the parties was a single contract, fulfilling the contract required a continuing relationship based on the provision of services. By procuring such services from Pro Axess, which operates its business in Utah, Sporoptic "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." Hanson, 357 U.S. at 253.

---

[3]Sporoptic argues that because the relationship between Sporoptic and Pro Axess evolved based on personal contacts between employees at Orlux and Pro Axess, there is no evidence that Sporoptic solicited Pro Axess. It is nonetheless clear that Sporoptic specifically solicited the contract at issue in this case.

In addition, Sporoptic and Orlux exchanged various direct communications with Pro Axess. Although "phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts," Far West Capital, 46 F.3d at 1077, such materials provide additional evidence that Sporoptic pursued a continuing business relationship with a Utah corporation. Sporoptic rightly points out that its direct communications with Pro Axess in Utah were minimal. However, it is not just Sporoptic's direct communications with Pro Axess that are relevant, but also Orlux's communications with Pro Axess. Companies conducting business through their subsidiaries can qualify as transacting business in a state, provided the parent exercises sufficient control over the subsidiary. See Curtis Publ'g Co. v. Cassel, 302 F.2d 132, 137 (10th Cir. 1962) ("[A] wholly owned subsidiary may be an agent and when its activities as an agent are of such a character as to amount to doing business of the parent, the parent is subjected to the in personam jurisdiction of the state in which the activities occurred."); Phone Directories Co. v. Contel Corp., 786 F. Supp. 930, 943 (D. Utah 1992) (noting that a parent company's exertion of "significant influence" on a subsidiary suffices for a court to exercise personal jurisdiction over parent).[4]

---

[4]Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13 (1984) (noting that in an action where both a parent and a subsidiary are co-defendants, "[e]ach defendant's contacts with the forum state must be assessed individually"), is not to the contrary. Keeton merely concludes that a court may not automatically

(continued...)

- 10 -

Sporoptic exercised considerable control over Orlux, which acted as its agent. For example, Sporoptic's president chose the president of Orlux. Specifically relevant to the instant case, Sporoptic's president approved the concept of selling a line of low-cost sunglasses in the United States, then used Orlux to implement the project. Orlux faxed Pro Axess a preliminary purchase order for sunglasses frames, and Sporoptic followed up with a formal purchase order confirming the details. Sporoptic relied on Orlux to cancel the order. Given this relationship, we examine not only Sporoptic's direct communications with Pro Axess, but also Orlux's communications with Pro Axess.

Sporoptic and Orlux exchanged numerous faxes, letters, and phone calls with Pro Axess in Utah about the order itself and the potential for modifications to the order. While the "quantum of contacts" between the parties is not determinative of personal jurisdiction, Far West Capital, 46 F.3d at 1077, the purposeful availment reflected in the content of these communications supports a Utah court's exercise of jurisdiction over Sporoptic.[5]

---

[4](...continued)
exercise jurisdiction over a parent corporation if the court may exercise jurisdiction over a subsidiary. See id.

[5]Consistent with our established practice, we evaluate not just the quantity of Sporoptic's contacts with Utah, but also the quality of those contacts. See OMI, 149 F.3d at 1092. The contacts that occurred while Pro Axess and Sporoptic were building a business relationship, maintaining that relationship, and attempting to salvage that relationship are more indicative of purposeful

(continued...)

### b. Arising Out Of

It is clear that there is a nexus between Sporoptic's contacts with Utah and Pro Axess's injuries, such that Pro Axess's injuries "arise out of or relate to [Sporoptic's] activities." Burger King, 471 U.S. at 472 (quotations omitted); see also OMI, 149 F.3d at 1095. Pro Axess's breach of contract claims arose from Sporoptic's solicitation of Pro Axess, development of a business agreement with Pro Axess, and subsequent communications with Pro Axess. Those same interactions also constitute Sporoptic's contacts with Utah. Thus, Pro Axess's claims arise out of Sporoptic's contacts with Utah.

Sporoptic argues that Pro Axess's presence in Utah is a coincidence that is inadequate to allow a Utah court to exercise specific personal jurisdiction over Sporoptic. However, this is not a case where "[t]he quality and nature" of Sporoptic's contact with Utah was "so random, fortuitous, or attenuated that it cannot fairly be said that [Sporoptic] should reasonably anticipate being haled into court" in Utah. Burger King, 471 U.S. at 486 (quotations and footnote

---

[5](...continued)
availment than are the contacts that occurred as the parties traded recriminations in advance of this lawsuit. Thus, we give less weight to the latter type of contacts in this case—most notably Sporoptic's fax to Pro Axess in response to Pro Axess's threat of litigation if payment were not received. Affording less weight to this latter type of contacts ensures that parties will not avoid attempting to resolve their disputes informally, for fear that the flow of communications as part of such efforts will subject them to jurisdiction in a foreign forum where they could not otherwise be haled into court.

- 12 -

omitted).  After all, this is not a case in which the defendant's only contacts with the forum resulted from the "unilateral activity of another party or a third person." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417 (1984). Thus, Sporoptic's reliance on Soma Med. Int'l and Lakeside Bridge & Steel Co. v. Mountain State Constr. Co., 597 F.2d 596 (7th Cir. 1979), is misplaced.  See Soma Med. Int'l, 196 F.3d at 1299 (involving a plaintiff going outside its home state to initiate contact with the defendant); Lakeside Bridge & Steel Co., 597 F.2d at 598, 603 (same).  Rather, Sporoptic voluntarily sought out and conducted business with Pro Axess, with whom Sporoptic had contracted before and whom Sporoptic therefore knew to be located in Utah.[6]

Although this is a somewhat close case, we believe that Sporoptic "purposefully directed [its] activities at residents of the forum, and the litigation result[ed] from alleged injuries that ar[o]se out of or relate to those activities." Burger King, 471 U.S. at 472 (quotations and citation omitted).  As a result, Sporoptic's "conduct and connection with the forum State [were] such that [it] should reasonably anticipate being haled into court there." World-Wide

---

[6]Sporoptic's effort to pin down the place of contract formation is unpersuasive.  After all, it is the full scope of a defendant's behavior, not simply the place of contract formation, that determines whether a court may exercise specific personal jurisdiction over a non-resident defendant in a breach of contract action.  See Burger King, 471 U.S. at 478-79.

Volkswagen, 444 U.S. at 297. Thus, we hold that Sporoptic had sufficient minimum contacts with Utah to support a Utah court's exercise of personal jurisdiction over Sporoptic.

### 2. Traditional Notions of Fair Play and Substantial Justice

In analyzing whether a court's exercise of personal jurisdiction offends "traditional notions of fair play and substantial justice," Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113 (1987), we determine "whether a district court's exercise of personal jurisdiction over a defendant with minimum contacts is reasonable in light of the circumstances surrounding the case." OMI, 149 F.3d at 1091 (quotations omitted). We do so by considering:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies.

Id. at 1095. The analyses of minimum contacts and reasonableness are complementary, such that

> the reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on [minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of [minimum contacts].

Id. at 1092 (alterations in original) (quotations omitted).

In this case, we have determined that Sporoptic "purposefully . . . directed [its] activities" at Utah. Burger King, 471 U.S. at 477. In such a case, "where a defendant . . . seeks to defeat jurisdiction, [it] must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id. Sporoptic cannot meet this exacting standard.

### a.       Burden on Defendant of Litigating in the Forum

"[T]he burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction. . . . When the defendant is from another country, this concern is heightened and great care and reserve should be exercised before personal jurisdiction is exercised over the defendant." OMI, 149 F.3d at 1096 (quotations omitted). However, "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." Burger King, 471 U.S. at 474 (quoting McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)).

In this case, Sporoptic's headquarters in France is a substantial distance from Utah, but Sporoptic's president has demonstrated his ability to journey to the United States for the company's business dealings by meeting with Pro Axess in New York. Moreover, Sporoptic owns a subsidiary in California. Thus, Sporoptic's employees and its agents travel to and operate in the United States to

conduct economic activity, minimizing concerns about the burden that litigating in Utah might place on them. Moreover, any fears that Sporoptic might not be able to obtain a fair trial because of language issues are misplaced, for the record reveals that Sporoptic's employees and agents regularly and adequately conduct business in English. Accordingly, forcing Sporoptic to litigate this dispute in Utah is not "gravely difficult and inconvenient." Burger King, 471 U.S. at 478.

### b. Forum State's Interest in Adjudicating the Dispute

"States have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." OMI, 149 F.3d at 1096. "The state's interest is also implicated where resolution of the dispute requires a general application of the forum state's laws." Id. In this case, this factor favors Utah's exercise of jurisdiction over Sporoptic. Pro Axess is a Utah corporation with its principal place of business in Utah, and the state has an interest in providing it with a forum for its suit against Sporoptic.[7]

### c. Plaintiff's Interest in Convenient and Effective Relief

This factor

> hinges on whether the Plaintiff may receive convenient and effective relief in another forum. This factor may weigh heavily in cases where

---

[7]Utah's interest in providing a forum for its citizens distinguishes this case from OMI and Asahi, where none of the parties were residents of the forum state. See Asahi, 480 U.S. at 114 (plurality opinion); OMI, 149 F.3d at 1096.

> a Plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit.

Id. at 1097. Because common law governs this suit, litigating the case in France, a civil law country, would be difficult. Moreover, Pro Axess's management would face the hardship of traveling to France and conducting litigation in a language with which it is not readily apparent that they are familiar. We find that Pro Axess would not be able to receive convenient and effective relief by bringing suit in France, thus this factor weighs in favor of Utah's exercise of jurisdiction.

### d. Interstate Judicial System's Interest in Obtaining Efficient Resolution

This factor asks "whether the forum state is the most efficient place to litigate the dispute." Id. "Key [sic] to this inquiry are the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation." Id. (citations omitted). Based on the nature of Pro Axess's claims against Sporoptic, and the fact that Sporoptic operated through Orlux, many of the witnesses in the dispute are based in the United States. Likewise, common law, not civil law, governed the dispute. Therefore, we find that litigating the dispute in Utah would be more efficient than doing so in France.

### e. States' Interest in Furthering Fundamental Substantive Social Policies

The fifth factor of the reasonableness inquiry "focuses on whether the exercise of personal jurisdiction by [the forum] affects the substantive social policy interests of other states or foreign nations." Id. "[G]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." Id. at 1097-98. Therefore, we must look closely at the extent to which an exercise of personal jurisdiction by Utah over Sporoptic interferes with France's sovereignty. Relevant facts include "whether one of the parties is a citizen of the foreign nation, whether the foreign nation's law governs the dispute, and whether the foreign nation's citizen chose to conduct business with a forum resident." Id. at 1098 (citations omitted). Sporoptic is a French company. However, this dispute is not governed by French law, and Sporoptic chose to conduct business with Pro Axess, a resident of Utah. Therefore, we find that an exercise of personal jurisdiction would not affect France's policy interests.

In sum, these five factors do not weigh in Sporoptic's favor. Sporoptic certainly cannot establish a "compelling case" that the exercise of jurisdiction by a Utah court would be unreasonable. Burger King, 471 U.S. at 477. Thus, we hold that Utah's exercise of personal jurisdiction over Sporoptic would not offend

traditional notions of fair play and substantial justice.[8]  Therefore, the district court's exercise of personal jurisdiction over Sporoptic satisfies both prongs of the federal due process analysis.

**B.    Nexus**

As noted in Soma Med. Int'l, Utah law on specific personal jurisdiction mandates that a nexus exist between Pro Axess's claims and Sporoptic's contacts with Utah.  196 F.3d at 1297.  This is analogous to part of the minimum contacts due process analysis above.  See OMI, 149 F.3d at 1095.  Because we found that Sporoptic's contacts with Utah fulfilled the requirements of the minimum contacts due process analysis, we also conclude that the required nexus exists under state law.

**C.    Utah Long-Arm Statute**

The Utah Supreme Court has stated that "any set of circumstances that satisfies due process will also satisfy the long-arm statute."  SII MegaDiamond, Inc. v. Am. Superabrasives Corp., 969 P.2d 430, 433 (Utah 1998).  This is because the Utah legislature has declared that the long-arm statute must be

---

[8]Because this suit is not governed by French law, many of the witnesses in this case are located in the United States, and proceedings in the alternative forum in France would not be conducted in English, this case is distinguishable from Benton, 375 F.3d at 1079-80 (ruling that a Colorado court could not exercise personal jurisdiction over Canadian defendant where the suit was governed by Canadian law, many witnesses were located in Canada, and proceedings in Canada would be conducted in English-speaking province).

- 19 -

interpreted broadly "so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution." Utah Code Ann. § 78-27-22. Thus, because the court's exercise of jurisdiction over Sporoptic in this case satisfies due process, that exercise also satisfies the Utah long-arm statute.

Accordingly, we conclude that both the federal and state inquiries for whether assertion of specific personal jurisdiction is proper are satisfied on the facts of this case, and therefore that the district court did not err in exercising jurisdiction over Sporoptic.[9]

## II.    Prejudgment Interest

We examine the district court's decision not to award prejudgment interest to Pro Axess for an abuse of discretion, reviewing de novo the legal analysis on which that decision is based. See Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1156 (10th Cir. 2000). We apply Utah law in conducting this analysis. See Webco Indus., Inc. v. Thermatool Corp., 278 F.3d 1120, 1134 (10th Cir. 2002) ("Prejudgment interest in a diversity action is . . . a substantive matter governed by state law."). We hold that the district court did not err in

---

[9]Contrary to Sporoptic's assertions, the fact that Pro Axess threatened to bring litigation in France is irrelevant to whether personal jurisdiction exists in Utah. Jurisdiction involves a court's ability to preside over a lawsuit—not a party's public posturing early on in a dispute.

denying Pro Axess's post-trial motion for prejudgment interest because Pro Axess's damages were not calculable with the mathematical certainty necessary to support such an award and were not established as of a particular date.

## A.    Calculability of Damages

Under Utah law, "[a] prejudgment interest award is proper when the damage is complete . . . [and] the loss can be measured by facts and figures." Lefavi v. Bertoch, 994 P.2d 817, 823 (Utah Ct. App. 2000) (quotations omitted). "[A] court may only award prejudgment interest if damages are calculable within a mathematical certainty." Id.

In this case, Pro Axess itself was not able to calculate its damages consistently during the period before trial, making clear that such damages were not "calculable within a mathematical certainty." In its January 1997 complaint, Pro Axess claimed damages of $342,000 plus prejudgment interest.[10] In its Rule 26(a) disclosures two years later, Pro Axess stated that its damages had not been determined. In a July 1999 response to an interrogatory, Pro Axess claimed

---

[10]This figure seems to have included $60,300 for parts already purchased plus other unspecified damages.

damages of $239,950 plus prejudgment interest.[11]  In an October 2000 affidavit

and in the May 2001 Pretrial Order, Pro Axess claimed damages of $309,603.[12]

The evolution of the amount of Pro Axess's damages claim during trial also

underscores the fact that those damages were not "calculable within a

mathematical certainty."  Pro Axess decreased its claim for unrealized gross

profits from $119,700 to $98,700 because it had overstated the lost revenue on

which those profits were based by $60,000.  Pro Axess also decreased its claim

for the cost of parts already purchased from $60,390 to $57,564 because it had

mistakenly included the cost of parts from another order.  Thus, at trial Pro

Axess's total claim for damages decreased by $13,826, plus the associated

difference in interest.

Further, Pro Axess's damages for unrealized gross profits simply were not

"calculable within a mathematical certainty" based on the evidence that Pro Axess

submitted to the district court.  Pro Axess submitted virtually no evidence in

support of its claim of a 35% gross profit margin.  Especially given Utah courts'

---

[11]This figure included $60,390 for parts already purchased, $17,950 in interest on those parts (at 10% for 36 months), $119,700 in unrealized gross profits (at a 35% profit margin), $35,910 in interest on unrealized profits (at 10% for 36 months), $5,000 in travel expenses, and $500-$1,000 for out of pocket expenses.

[12]This figure included $60,390 for parts already purchased, $40,076 in interest on those parts (at 10% for 62 months, 10 days), $119,700 in unrealized gross profits (at a 35% profit margin), $79,437 in interest on unrealized profits (at 10% for 62 months, 10 days), and $10,000 in travel expenses and other costs.

reluctance to award prejudgment interest for unrealized profits, see Canyon Country Store v. Bracey, 781 P.2d 414, 422 (Utah 1989) ("While the basis of the 'formula' used to determine Canyon Country's lost profits may have been sufficient for the jury to render a verdict in favor of Canyon Country, it is too speculative to allow for the addition of prejudgment interest."), Pro Axess's evidence of its gross profit margin is clearly inadequate to support the award of prejudgment interest.

Similarly, Pro Axess failed to provide any written support for its claimed travel costs and other expenses. One of Pro Axess's employees noted that in calculating these expenses "we didn't get down to specifics" but instead "looked at the trips that we had taken, some of the other out-of-pocket costs, and came up with a round figure." Such an effort clearly does not establish damages "calculable within a mathematical certainty."

Pro Axess argues that the variance over time in the amount of damages that it sought came as a result of a mistake in calculation, and that such a mistake should not defeat its claim for prejudgment interest. In support of this contention, Pro Axess relies on Lefavi's finding that a defendant's failure to keep proper records should not bar an award of prejudgment interest. See Lefavi, 994 P.2d at 823. However, in this case it is the inability of Plaintiff—not Defendants—to keep proper records that impedes Plaintiff's attempt to establish damages

"calculable within a mathematical certainty."  It is well-established under Utah law that a plaintiff's inability to calculate its damages accurately may bar the award of prejudgment interest.  See Anesthesiologists Assoc., 852 P.2d at 1042 n.11 ("Although arriving at this figure should only have been a matter of adding up the number of late-night visits made by nurse anesthetists over the contract period, it would be unfair to charge prejudgment interest against the [defendant] when [the plaintiff], due to inadequate records or otherwise, apparently could not arrive at a mathematically precise figure at the time it filed its Amended Complaint.").  Thus, Pro Axess's reliance on Lefavi is misplaced.

Finally, the fact that a jury has already awarded damages in this case does not mean that damages were "calculable within a mathematical certainty." Because it is "axiomatic that all claims can be reduced eventually to monetary value," "[c]ommon sense" precludes the conclusion that merely because damages have been calculated by a jury, they are "calculable within a mathematical certainty." Canyon Country Store, 781 P.2d at 422.

Thus, Pro Axess is not entitled to prejudgment interest because its damages were not "calculable within a mathematical certainty."

**B.** **Date from which Interest Would Run**

For a prejudgment interest award to be proper under Utah law, not only must damages be "calculable within a mathematical certainty," but also "the amount of loss [must be] fixed as of a particular time." Lefavi, 994 P.2d at 823; see also Cornia v. Wilcox, 898 P.2d 1379, 1387 (Utah 1995) ("Where the damage is complete and the amount of the loss is [measurably] fixed as of a particular time . . . interest should be allowed from that time . . . .") (emphasis added, quotations omitted).

In this case, because Pro Axess never established the date on which it suffered damages—the date from which prejudgment interest should run—an award of prejudgment interest is not proper. In the above-mentioned October 2000 affidavit and May 2001 Pretrial Order, Pro Axess asserted that prejudgment interest should be calculated from July 31, 1995, which was the initial shipping date for the sunglasses frames. At trial, Pro Axess asserted that the July 31 shipping date had been canceled by mutual agreement and that as late as spring 1996 there was still no agreement as to the shipping date. Thus, Pro Axess's position at trial implies that it did not sustain damages on July 31, 1995. Because there was no special verdict form requesting that the jury set a date for the beginning of the running of prejudgment interest, the jury did not make a finding

as to that issue.[13] Pro Axess's post-trial motion for prejudgment interest asserted that June 1, 1995 was the date from which prejudgment interest should run. Therefore, it is unclear whether interest should be calculated from June 1, 1995, as Pro Axess now maintains; July 31, 1995, as Pro Axess earlier maintained; or some other date entirely, as is implied by Pro Axess's earlier assertion that the order had been delayed from July 31, 1995 by mutual agreement of the parties. This uncertainty renders the award of prejudgment interest improper under Utah law.

For all these reasons, the district court did not err in declining to award prejudgment interest to Pro Axess.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment and the district court's denial of Pro Axess's request for prejudgment interest.

---

[13]Pro Axess did not object to the lack of jury instructions or a special verdict form on this issue.